**SHELL OIL COMPANY**

v.

**ENVIRONMENTAL PROTECTION AGENCY.**

Nos. 80–1532, 80–1570, 80–1572, 80–1869, 80–1881A, 80–1888, 80–1890, 80–1909A, 80–1938, 80–1955A, 80–1976, 80–1978A, 80–1987A, 80–1988, 80–1998 and 81–1452.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 17, 1990.

Decided Dec. 6, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 12, 1992.

Michael W. Steinberg, with whom Hunter L. Prillaman, Arline M. Sheehan, G. William Frick, and Ralph J. Colleli, Jr. were on the brief, for Shell Oil Co. and American Petroleum Institute, et al. ("API"), petitioners in 80–1532 and 80–1881A, and intervenors in 81–1452. John R. Quarles, Scott A. Harman, John C. Chambers, Jr., and Stark Ritchie also entered appearances for Shell Oil and API.

Donald J. Patterson, with whom John N. Hanson, Aaron H. Goldberg, Edward M. Green, and Roderick T. Dwyer were on the brief, for American Min. Congress, et al. ("AMC"), petitioners in 80–1987A and intervenors in 80–1532, 80–1978A, and 81–1452. John D. Giglio, James R. Walpole, Susan L. Smith, John D. Fognani, and John D. Austin, Jr. also entered appearances for AMC.

Karen D. Florini for Environmental Defense Fund ("EDF"), petitioner in 80–1978A and intervenor in 81–1452. David J. Lennett also entered an appearance for EDF.

David F. Zoll, Ronald Shipley, and John T. Smith II were on the joint brief for Chemical Mfrs. Ass'n ("CMA"), petitioner in 80–1572 and 80–1976 and intervenor in 80–1532 and 81–1452. Theodore L. Garrett, Clare Dalton, and Jennifer L. Machlin also entered appearances for CMA.

Karl S. Bourdeau, Steven F. Hirsch, and Barton C. Green were on the joint brief for American Iron and Steel Institute, et al., petitioners in 80–1888 and intervenors in 80–1532 and 81–1452. Gary H. Baise and David R. Berz also entered appearances for American Iron and Steel Institute, et al.

William R. Weissman and Douglas H. Green were on the joint brief for petitioners Edison Elec. Institute, et al., in 80–1890 and intervenors Cincinnati Gas and Electric Co., et al., in 80–1532, 80–1570, 80–1572, and 81–1452. Thomas H. Truitt, Charles C. Abeles, and David B. Weinberg also entered appearances for Edison Elec. Institute, et al., and Cincinnati Gas & Electric, et al.

Michael S. Giannotto was on the joint brief for petitioners Dawn Min. Co., et al., in 80–1998. Benjamin W. Boley and James R. Bieke also entered appearances for Dawn Min. Co., et al.

Kurt E. Blase was on the joint brief for petitioner Kennecott Corp. in 80–1938. Alfred V.J. Prather, Edwin H. Seeger, and Carl B. Nelson, Jr., also entered appearances for Kennecott Corp.

William L. Roseby was on the joint brief for petitioner Ford Motor Co. in 80–1988.

John D. Conner, Robert L. Ackerly, Christine Volz, and Richard A. Flye entered appearances for petitioner The Fertilizer Institute in 80–1570 and 80–1869.

Kenneth A. Rubin and John R. Quarles, Jr. entered appearances for petitioners Gulf and Western Natural Resources Group and Stablex Corp. in 80–1909A and 80–1955A.

William C. Brashares and Charles A. Samuels entered appearances for Nat. Solid Wastes Management Ass'n, petitioner in 81–1452 and intervenor in 80–1532.

Mary Elizabeth Ward and Christopher S. Vaden, Attorneys, Dept. of Justice, with whom Barry M. Hartman, Deputy Asst. Atty. Gen., E. Donald Elliott, Gen. Counsel, Joshua D. Sarnoff, and Steven E. Silverman, Attorneys, E.P.A. ("EPA"), were on the brief, for respondent in all cases. Lee R. Tyner, Lloyd S. Guerci, Anthony Z. Reisman, and Diane L. Donley, Attorneys, Dept. of Justice, and Mark A. Greenwood, Caroline Wehling, and Michael Dworkin, Attorneys, EPA, also entered appearances for respondent.

Daniel J. Greenwald III, James R. Walpole, and Gregory Chafee entered appearances for intervenors American Paper Institute and Nat. Forest Products Ass'n in 80–1532 and 81–1452.

David R. Case entered an appearance for intervenor Hazardous Waste Treatment Council in 80–1532.

Richard E. Schwartz entered an appearance for intervenor American Footwear Industries Ass'n in 80–1532.

Sean O. Coffey entered an appearance for intervenor Department of Environmental Management of the State of Rhode Island in 80–1532.

David S. Tatel, Peter A. Rohrbach, and Sheldon E. Steinbach entered appearances for intervenor American Council on Educ. in 80–1532.

Charles M. Darling IV, J. Patrick Berry, and Stephen L. Teichler entered appearances for intervenors Tenneco Oil Co., et al. in 80–1532.

Lee C. White and Robert J. Saner II entered appearances for intervenor Ass'n of Metropolitan Sewerage Agencies in 80–1532.

Karl S. Bourdeau entered an appearance for intervenor Dow Chemical Co. in 81–1452.

J. Brian Molloy entered an appearance for intervenor SCA Services in 81–1452.

Before BUCKLEY, WILLIAMS and THOMAS,* Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

In these consolidated cases, petitioners challenge both the substance of several rules promulgated by the Environmental Protection Agency pursuant to the Resource Conservation and Recovery Act of 1976 and its compliance with the Administrative Procedure Act's rulemaking requirements.

Consolidated petitioners [1] challenge two rules that categorize substances as hazard-

---

* Former *Circuit Judge* THOMAS, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion.

1. Consolidated petitioners' brief was filed on behalf of petitioners American Iron and Steel Institute; American Mining Congress; American Petroleum Institute, *et al.;* Chemical Manufacturers Association; Cyprus Foote Mineral Company; Dawn Mining Company; Edison Electric Institute, *et al.;* Ford Motor Company; Idarado Mining Company; Kennecott Corporation; Magma Copper Company; Newmont Gold Company; and Shell Oil Company, and on be-

ous wastes until a contrary showing has been made: the "mixture" rule, which classifies as a hazardous waste any mixture of a "listed" hazardous waste with any other solid waste, and the "derived-from" rule, which so classifies any residue derived from the treatment of hazardous waste. They argue that the EPA failed to provide adequate notice and opportunity for comment when it promulgated the mixture and derived-from rules, and that the rules exceed the EPA's statutory authority.

Three petitioners present separate challenges to other rules included in the same rulemaking. In the first, the American Mining Congress asserts that the EPA exceeded its statutory authority and failed to provide notice and opportunity to comment in defining "treatment" to include processes designed to recover valuable materials from the recycling of solid wastes. Second, the American Petroleum Institute attacks the EPA's requirement of "leachate monitoring" at land treatment facilities for failure to provide notice and opportunity to comment. (In land treatment, waste is placed upon land or incorporated into the surface soil. Leachate monitoring tests water that has passed through the soil to assure that hazardous wastes or their constituents are not migrating through it.) Finally, the Environmental Defense Fund challenges the EPA's "permit-shield" provision, a regulation that, with some exceptions, exempts a facility from enforcement proceedings for statutory violations if it is in compliance with its permit conditions.

We agree with petitioners that the EPA failed to give sufficient notice and opportunity for comment in promulgating the "mixture" and "derived-from" rules and the leachate monitoring requirement. We therefore remand the rules to the Administrator. We conclude that the regulatory definition of "treatment" does not comport with the statutory definition. The regulation of resource recovery, however, falls within the EPA's broad authority under Subtitle C to regulate hazardous waste

management. Therefore, we deny the American Mining Congress's petition. We also reject its contention that the EPA failed to provide adequate notice of the regulation of resource recovery. As for the permit-shield provision, all parties agree that it cannot trump the citizen's statutory right to sue. As applied to the Agency, however, the regulation lies well within the limits of the EPA's enforcement discretion.

I. BACKGROUND

The EPA promulgated the disputed rules in order to implement the Resource Conservation and Recovery Act ("RCRA"), Pub.L. No. 94–580, 90 Stat. 2795 (1976) (codified as amended at 42 U.S.C. §§ 6901–87 (1988)).[2] RCRA created a "cradle-to-grave" system for tracking wastes from their generation to disposal. The statute consists of two main parts: one governs the management of non-hazardous solid waste; the other, hazardous waste. *See American Mining Congress v. EPA*, 824 F.2d 1177, 1179 (D.C.Cir.1987) ("*AMC I*").

As enacted, Subtitle C of RCRA required the EPA to establish a comprehensive national system for safely treating, storing, and disposing of hazardous wastes. It defined "hazardous waste," in part, as a "solid waste" which may "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5) (1976). It gave the EPA until April 21, 1978 to develop and promulgate criteria for identifying characteristics of hazardous waste and to list particular wastes as hazardous. *See id.* § 6921(a), (b). It further required the EPA to promulgate regulations "as may be necessary to protect human health and the environment" respecting the practices of generators, transporters, and those who own or operate hazardous waste treatment, storage, or disposal facilities. *Id.* §§ 6922–

half of intervenors Cincinnati Gas & Electric Company, *et al.*

2. Because the EPA promulgated the challenged regulations before amendments to RCRA in 1980, 1982, and 1984, references are to the 1976 version of the United States Code.

6924. RCRA prohibited treatment, storage, or disposal of hazardous waste without a permit and required the EPA to promulgate standards governing permits for facilities performing such functions. *Id.* § 6925.

On February 17, 1977, the EPA published a Notice of Intent to Develop Rulemaking, 42 Fed.Reg. 9,803 (1977); and on May 2, 1977, it published an Advance Notice of Proposed Rulemaking, 42 Fed.Reg. 22,332 (1977), which set forth detailed questions on each of the subsections of Subtitle C. In addition, it circulated for comment several drafts of regulations, met with experts and representatives of interested groups, and held public hearings. This process culminated in the publication, on December 18, 1978, of proposed regulations covering most of the statutorily required standards. *See* 43 Fed.Reg. 58,946–59,022 (1978).

This proposal elicited voluminous comment, and the EPA held five large public hearings. The EPA failed to issue final regulations by the April 1978 statutory deadline; several parties sued the Agency to compel it to do so. Although the district court initially ordered the EPA to promulgate the regulations by December 31, 1979, the complexity of the task led the court to modify the order to require, instead, that the EPA use its best efforts to issue them by April 1980.

The EPA published its "[r]evisions to final rule and interim final rule" on May 19, 1980. 45 Fed.Reg. 33,066 (1980). It noted that time pressures had had an effect on the new regulations: Because of limited information, the Agency was unable to avoid underregulation and overregulation. It complained that the demands of developing a national, comprehensive system of hazardous-waste management made precise tailoring to individual cases impossible. *See id.* 33,088.

More than fifty petitions were brought to challenge these final rules. In 1982, we deferred briefing on these challenges to allow the parties to pursue settlement discussions and ordered the EPA to file monthly status reports. We did not stay the rules, however, which have remained in effect. Most of the issues have been resolved by settlement, by subsequent statutory or regulatory revision, or by the failure of petitioners to pursue them. The issues presented here are those that the EPA identified in January 1987 as unlikely to be settled, and that were subject to the briefing schedule established by this court on June 12, 1989.

Consolidated petitioners assert that the regulations proposed on December 18, 1978 did not foreshadow the inclusion of the mixture and derived-from rules in the final rule's definition of "hazardous waste." *See* 45 Fed.Reg. 33,119–20 (40 C.F.R. § 261.3). Thus, they assert, they were deprived of adequate notice and opportunity for comment. They also claim that the EPA exceeded its statutory authority by including the two rules in the final definition of hazardous waste. The American Mining Congress challenges the statutory authority for the definition of "treatment" found in the final rules. *See id.* 33,076 (40 C.F.R. § 260.10(73)). The American Petroleum Institute attacks the leachate monitoring requirements for land treatment facilities included in the final rules, *see id.* 33,248 (40 C.F.R. § 265.278(b)(2)), because the proposed regulations did not address the possibility of imposing such a requirement, thus depriving them of adequate notice and opportunity for comment. The Environmental Defense Fund asserts that the issuance of the permit-shield rule, which first appeared in the May 1980 rulemaking, *see id.* 33,428 (40 C.F.R. § 122.-13(a)), was arbitrary and capricious and that the rule is outside the scope of the statute. We consider each of these challenges in turn.

## II. DISCUSSION

### A. Principles Governing Judicial Review

■ The Administrative Procedure Act ("APA") governs judicial review of final regulations promulgated under RCRA. 42 U.S.C. § 6976 (1976) (citing 5 U.S.C. §§ 701–706). In issuing regulations, the EPA must observe the notice-and-comment procedures of the APA, 5 U.S.C. § 553(b) (1988), and the public-participation directive

of RCRA, 42 U.S.C. § 6974(b) (1976). The relationship between the proposed regulation and the final rule determines the adequacy of notice. A difference between the two will not invalidate the notice so long as the final rule is a "logical outgrowth" of the one proposed. If the deviation from the proposal is too sharp, the affected parties will not have had adequate notice and opportunity for comment. *See American Fed'n of Labor v. Donovan,* 757 F.2d 330, 338–39 (D.C.Cir.1985).

■ RCRA defines the scope of the EPA's regulatory discretion: In formulating rules, the clearly expressed intent of Congress binds agencies as it binds courts. Where congressional intent is ambiguous, however, an agency's interpretation of a statute entrusted to its administration is entitled to deference, so long as it is reasonable. *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

### B. The Mixture and Derived–From Rules

■ The mixture and derived-from rules are to be found in the definition of "hazardous waste" that appears in the final rules. That definition includes as hazardous all wastes resulting from mixing hazardous and other wastes and from treating, storing, or disposing of hazardous wastes, until such time as the wastes are proven nonhazardous. Petitioners protest that these provisions had no counterpart in, and were not a logical outgrowth of, the proposed regulations; thus, the promulgation of the rules violated the notice-and-comment requirements of RCRA and the APA. We agree.

#### 1. *Statutory Background*

To become subject to RCRA's comprehensive regulatory system, a material must be a hazardous waste, which RCRA defines, in part, as:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

\* \* \* \* \* \*

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5) (1976). To determine what materials fall within that definition, the EPA must promulgate criteria for the identification and listing of hazardous wastes. The statute provides the EPA with specific instructions for identifying and listing hazardous waste:

(a) Criteria for identification or listing

Not later than eighteen months after October 21, 1976, the Administrator shall, after notice and opportunity for public hearing, and after consultation with appropriate Federal and State agencies, develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this subchapter, taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics. Such criteria shall be revised from time to time as may be appropriate.

(b) Identification and listing

Not later than eighteen months after October 21, 1976, and after notice and opportunity for public hearing, the Administrator shall promulgate regulations identifying the characteristics of hazardous waste, and listing particular hazardous wastes (within the meaning of section 6903(5) of this title), which shall be subject to the provisions of this subchapter. Such regulations shall be based on the criteria promulgated under subsection (a) of this section and shall be revised from time to time thereafter as may be appropriate.

*Id.* § 6921(a), (b).

#### 2. *The Proposed Regulations*

In its proposed regulations, the EPA adopted the following definition of "hazardous waste":

"Hazardous waste" has the meaning given in [RCRA, 42 U.S.C. § 6903(5)] *as*

*further defined and identified in this Subpart.*

43 Fed.Reg. 58,955 (proposed 40 C.F.R. § 250.11(b)(3)) (emphasis added). The regulations then set forth the following scheme for identifying and listing hazardous wastes:

(a) *Criteria for identifying the characteristics of hazardous waste.* A characteristic of hazardous waste will be established under § 250.13 where, based on information from damage incidents or scientific and technical information, the Administrator determines that:

(1) The characteristic can be defined in terms of specific physical, chemical, toxic, infectious, or other properties of a solid waste that will cause the waste to be a hazardous waste pursuant to the definition in [42 U.S.C. § 6903(5)], and

(2) The properties defining the characteristic are measurable by standardized and available testing protocols applicable to waste.

(b) *Criteria for listing hazardous waste.* A solid waste, or source or class of solid waste, will be listed as a hazardous waste in § 250.14 if the Administrator determines that the solid waste:

(1) Possesses any of the characteristics defined in § 250.13, and/or

(2) Meets the definition of hazardous waste found in [42 U.S.C. § 6903(4)].

43 Fed.Reg. 58,955 (proposed 40 C.F.R. § 250.12(a), (b)).

Although the EPA initially identified nine possible characteristics as potentially hazardous, it decided to rely on only four of them—ignitability, corrosivity, reactivity, and toxicity—in its proposed section 250.13, because only these could be tested reliably and inexpensively. *Id.* 58,950, 58,-955–57. Because solid wastes that present a hazard but do not display one of these four characteristics remained subject to RCRA, the EPA proposed to list such wastes specifically, *id.* 58,957–58 (proposed

40 C.F.R. § 250.14), and to treat any waste once listed as hazardous until a person managing the waste filed a delisting petition and demonstrated to the EPA that the waste did not pose a hazard. *Id.* 58,959–60 (proposed 40 C.F.R. § 250.15).

### 3. *The Final Rules*

The final rules defined a hazardous waste more broadly than did the proposed regulations. Under the final rules, a hazardous waste is a solid waste that is not specifically excluded from regulation and meets any one of the following criteria:

(i) It is listed in Subpart D and has not been excluded from the lists in Subpart D under §§ 260.20 and 260.22 of this Chapter.

(ii) It is a mixture of solid waste and one or more hazardous wastes listed in Subpart D and has not been excluded from this paragraph under §§ 260.20 and 260.22 of this Chapter.

(iii) It exhibits any of the characteristics of hazardous waste identified in Subpart C.

45 Fed.Reg. 33,119 (40 C.F.R. § 261.-3(a)(2)).[3] In addition, a solid waste generated from the treatment, storage, or disposal of a hazardous waste is considered a hazardous waste. *Id.* 33,120 (40 C.F.R. § 261.-3(c)(2)).

In establishing criteria for identifying and listing hazardous wastes in its final rules, the EPA relied heavily on the dangers that such wastes pose. *See* 45 Fed. Reg. 33,121 (40 C.F.R. §§ 261.10–.11). Thus the EPA compiled a list of toxic constituents as a starting point and required that a waste be listed as hazardous if it (1) exhibits one of the four characteristics of hazardous waste identified in Subpart C of the regulations ("hazardous characteristics"), (2) meets certain toxicity criteria, or (3)

contains any of the toxic constituents listed in Appendix VIII unless, after considering any of the following factors, the

---

**3.** The characteristics of hazard are discussed at 45 Fed.Reg. 33,121–22 (40 C.F.R. Part 261 Subpart C). Wastes that are hazardous because they possess the characteristics of hazard will be

referred to as "Subpart C" wastes. Listed hazardous wastes are discussed at 45 Fed.Reg. 33,-122–33 (40 C.F.R. Part 261 Subpart D) and will be referred to as "Subpart D" wastes.

Administrator concludes that the waste is not capable of posing a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed.

*Id.* 33,121 (40 C.F.R. § 261.11(a)(1)–(3)). The final rules, moreover, provide for delisting by formal notice and comment rulemaking rather than by the more informal procedure using defined thresholds that was initially proposed by the EPA. *Id.* 33,076–77 (40 C.F.R. §§ 260.20, 260.22); 43 Fed.Reg. 58,959–60 (proposed 40 C.F.R. § 250.15).

A number of interested parties had challenged the listing of classes of wastes in the proposed regulations as an unwarranted expansion of the statutory phrase "particular wastes," which, they asserted, required the listing of specific wastes only. *See* 45 Fed.Reg. 33,114. The EPA nevertheless retained the proposed scheme in its final rules, stating that its use of classes was justified by the complexity of the factors bearing on hazard and the impossibility of defining a numerical threshold level for hazardous characteristics. *See id.* 33,105.

### 4. *The Mixture Rule*

The mixture rule requires that a waste be treated as hazardous if

[i]t is a mixture of solid waste and one or more hazardous wastes listed in Subpart D and has not been excluded from this paragraph under §§ 260.20 and 260.22 of this Chapter.

45 Fed.Reg. 33,119 (40 C.F.R. § 261.-3(a)(2)(ii)). Once classified as hazardous, then, a mixture must be so treated until delisted.[4]

The EPA acknowledged at the outset that the mixture rule was "a new provision," and that it had no "direct counterpart in the proposed regulations." 45 Fed. Reg. 33,095. Nevertheless, it added the rule

for purposes of clarification and in response to questions raised during the comment period concerning waste mixtures and when hazardous wastes become subject to and cease to be subject to the Subtitle C hazardous waste management system.

*Id.*

Although admitting that it had failed to say so in the proposed regulations, the EPA stated that it had "intended" to treat waste mixtures containing Subpart D wastes as hazardous. It then presented the mixture rule as necessary to close "a major loophole in the Subtitle C management system." *Id.* 33,095. Otherwise, generators of hazardous waste "could evade [those] requirements simply by commingling [Subpart D] wastes with nonhazardous solid waste" to create a waste that did not demonstrate any of the four testable characteristics but that posed a hazard for another reason. *Id.* The Agency explained that although the mixture rule might include waste with concentrations of Subpart D wastes too low to pose a hazard, the delisting process and the possibility of segregating waste to avoid the problem mitigated the burden of the rule. Finally, the EPA invoked the practical difficulties of its task to justify the rule's adoption:

Because the potential combinations of listed wastes and other wastes are infinite, we have been unable to devise any workable, broadly applicable formula which would distinguish between those waste mixtures which are and are not hazardous.

*Id.*

While the EPA admits that the mixture rule lacks a clear antecedent in the proposed regulations, it nonetheless argues that the rule merely clarifies the intent behind the proposal that listed wastes remain hazardous until delisted: As industry could not have reasonably assumed that a generator could bring a listed waste outside the generic listing description simply

---

**4.** The EPA notes that subsequent regulatory action limits petitioners' challenge of the mixture rule to listed wastes, because a mixture that does not exhibit any of the four testable charac-

teristics is no longer classified as hazardous. *See* Brief for Respondent at 37 n. 28 (citing 40 C.F.R. § 261.3(a)(2)(iii) (1988)).

by mixing it with a nonhazardous waste, the rule cannot be seen as a "bolt from the blue." *Cf. WJG Telephone Co., Inc. v. FCC*, 675 F.2d 386, 388–90 (D.C.Cir.1982).

### 5. *The Derived–From Rule*

The derived-from rule provides that

[a]ny solid waste generated from the treatment, storage or disposal of a hazardous waste, including any sludge, spill residue, ash, emission control dust or leachate (but not including precipitation run-off), is a hazardous waste.

45 Fed.Reg. 33,120 (40 C.F.R. § 261.3(c)(2)). Subpart D wastes continue to be regulated as hazardous until delisted; a solid waste derived from Subpart C wastes may emerge from regulation if it does not itself display a hazardous characteristic. *See id.* 33,120 (40 C.F.R. § 261.3(d)).

The EPA's justifications for the derived-from rule resemble those for the mixture rule. Arguing that the products of treatment, storage, or disposal of listed hazardous wastes usually continue to pose hazards, the EPA defends the rule as "the best regulatory approach we can devise," given the fact that "[w]e are not now in a position to prescribe waste-specific treatment standards which would identify those processes which do and do not render wastes or treatment residues nonhazardous." 45 Fed.Reg. 33,096. The EPA acknowledged, however, that the rule was a new provision, "added both in response to comment and as a logical outgrowth of [§ 261.3(b) ]." *Id.*

### 6. *Adequacy of Notice*

Although the EPA acknowledges that neither of the two rules was to be found among the proposed regulations, it nevertheless argues that they were foreseeable—and, therefore, the notice adequate—because certain of the comments received in response to the rulemaking appeared to anticipate both the mixture and the derived-from rules. We are unimpressed by the scanty evidence marshaled in support of this position.

The only comment actually cited by the EPA was made by the Manufacturing Chemists Association, which stated that under the proposed regulations, "a listed waste is a hazardous waste regardless of quantity or concentration," and that "[i]t is not reasonable to classify *all* waste streams which contain *any* concentration of one of the specific wastes as hazardous." EPA, Comments of Manufacturing Chemists Ass'n, D–1384 at 74, *reprinted in* Joint Appendix ("J.A.") at 114 (emphasis in the original). This comment, we note, addresses the initial classification of a waste as hazardous rather than the problem of how to deal with residues resulting from the treatment of wastes, or with their subsequent mixture with other, nonhazardous materials.

The EPA also draws attention to a response it made before the close of the comment period to a question posed by the American Mining Congress in which the Agency indicated that the delisting procedure would permit generators to remove wastes from the RCRA system. This, apparently, is supposed to have alerted interested parties that delisting would be the only means of exit from regulation. But examination of the precise words that the EPA used reveals a different message. The EPA stated that "[de]listing provides a means on a case by case basis for [the generator of a given waste] to demonstrate that that waste does not belong in the system at all." EPA, Transcript of Public Hearing (Mar. 7–9, 1979), D–2703 at 29, *reprinted in* J.A. at 163. This response concerned the exclusion from regulation of wastes included by initial regulatory error, not the deregulation of wastes that have ceased to be hazardous.

The EPA's remaining evidence of implied notice is equally unimpressive. It consists of generalized references to comments urging that wastes be evaluated only according to the four easily testable characteristics, EPA, 1980 Background Document, D–2377 at 51, *reprinted in* J.A. at 575, and requests that the regulations specifically address the disposition of incinerator ash. *Id.*, D–2372 at 46, *reprinted in* J.A. at 549.

An agency, of course, may promulgate final rules that differ from the proposed regulations. To avoid "the absurdity

that ... the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary," *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C.Cir.1973), we have held that final rules need only be a "logical outgrowth" of the proposed regulations. *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 546–47 (D.C.Cir.1983) (canvassing precedent). But an unexpressed intention cannot convert a final rule into a "logical outgrowth" that the public should have anticipated. Interested parties cannot be expected to divine the EPA's unspoken thoughts. *See Small Refiner,* 705 F.2d at 548–49. The reasons given by the EPA in support of its contention that interested parties should have anticipated the new rules are simply too insubstantial to justify a finding of implicit notice.

While it is true that such parties might have anticipated the potential for avoiding regulation by simply mixing hazardous and nonhazardous wastes, it was the business of the EPA, and not the public, to foresee that possibility and to address it in its proposed regulations. Moreover, while a comment may evidence a recognition of a problem, it can tell us nothing of how, or even whether, the agency will choose to address it. The comments the EPA cites strike us as sparse and ambiguous at best. Some address similar concerns, but none squarely anticipates the rules.

■ Even if the mixture and derived-from rules had been widely anticipated, comments by members of the public would not in themselves constitute adequate notice. Under the standards of the APA, "notice necessarily must come—if at all—from the Agency." *Small Refiner,* 705 F.2d at 549; *see also American Fed'n of Labor v. Donovan,* 757 F.2d at 340 (holding that the court cannot "properly attribute notice to [interested parties] on the basis of an assumption that they would have monitored the submission of comments."). Although we have held that comments raising a foreseeable possibility of agency action can be a factor in providing notice, *NRDC v. Thomas,* 838 F.2d

1224, 1243 (D.C.Cir.), *cert. denied sub nom. Alabama Power Co. v. Thomas,* 488 U.S. 888, 109 S.Ct. 219, 102 L.Ed.2d 210 (1988), this is not such a case. While, in *Thomas,* the New York State Attorney General's Office suggested a regulatory approach similar to that finally adopted by the EPA, the Agency itself gave warning of its approach two weeks before final promulgation, and the industry petitioners had "at least a limited opportunity to focus a direct attack." *Id.* In fact, they "managed to file objections 7–10 days before the final regulations were signed." *Id.* We nevertheless acknowledged that the case "stretche[d] the concept of 'logical outgrowth' to its limits." *Id.* In contrast, here, the ambiguous comments and weak signals from the agency gave petitioners no such opportunity to anticipate and criticize the rules or to offer alternatives. Under these circumstances, the mixture and derived-from rules exceed the limits of a "logical outgrowth."

The EPA's argument also fails to take into account a marked shift in emphasis between the proposed regulations and the final rules. Under the EPA's initial regulatory strategy, the

> EPA planned to identify and quantitatively define all of the characteristics of hazardous waste.... Generators would be required to assess their wastes in accordance with these characteristics and EPA would list hazardous wastes where it had data indicating the wastes exhibited one of the identified characteristics.

45 Fed.Reg. 33,106. As a consequence, listing was to "play [the] largely supplementary function" of increasing the "certainty" of the process. *Id.* Listing was also to have relieved generators of listed wastes of the burden of testing for characteristics "unless they wish to demonstrate that they are not subject" to Subtitle C regulation. 43 Fed.Reg. 58,951. Thus, the proposed regulations imposed, as a generator's principal responsibility, the duty to test wastes for hazardous characteristics and suggested that if the required tests failed to reveal a hazard, the waste would not need to be managed as hazardous.

The final rules, however, place a heavy emphasis on listing. As a consequence, the final criteria for listing are "considerably expanded and more specific" than those proposed. 45 Fed.Reg. 33,106. The EPA justified this "change in emphasis in [its] regulatory strategy," *id.* 33,107, on the basis that it was "not fully confident that it can suitably define and construct testing protocols for [several] characteristics." *Id.*

Whatever the basis for this shift in strategy, it erodes the foundation of the EPA's argument that the mixture rule was implicit in the proposed regulations. A system that would rely primarily on lists of wastes and waste-producing processes might imply inclusion of a waste until it is formally removed from the list. The proposed regulations, however, did not suggest such a system. Rather, their emphasis on characteristics suggested that if a waste did not exhibit the nine characteristics originally proposed, it need not be regulated as hazardous. We conclude, therefore, that the mixture rule was neither implicit in nor a "logical outgrowth" of the proposed regulations.

Similarly, while the derived-from rule may well have been the best regulatory approach the EPA could devise, 45 Fed. Reg. 33,096, it was not a logical outgrowth of the proposed regulations. The derived-from rule is not implicit in a system based upon testing wastes for specified hazardous characteristics—the system presented in the proposed regulations. To the contrary, the derived-from rule becomes counterintuitive as applied to processes designed to render wastes nonhazardous. Rather than presuming that these processes will achieve their goals, the derived-from rule assumes their failure.

Our opinion in *Chemical Waste Management, Inc. v. EPA*, 869 F.2d 1526 (D.C.Cir. 1989), does not suggest a contrary result. There, we characterized the regulation providing for the retroactive application of the derived-from rule as "an entirely reasonable (if not inevitable) construction of the regulation," and found that the EPA provided adequate notice and opportunity for

comment on that regulation. *Id.* 1534–35. That holding, however, had no bearing on the validity of the derived-from rule itself, as that question was not before the court. *See id.* 1530 n. 4.

■ The EPA maintains, finally, that it had considered and rejected the points raised by petitioners, and argues that they cannot show prejudice from its failure to provide notice and opportunity to comment. While petitioners must show that they would have submitted new arguments to invalidate rules in the case of certain procedural defaults, such as an agency's failure to provide access to supplemental studies, *see Air Transport Ass'n of America v. CAB*, 732 F.2d 219, 224 n. 11 (D.C.Cir. 1984), petitioners need not do so here, where the agency has entirely failed to comply with notice-and-comment requirements, and the agency has offered no persuasive evidence that possible objections to its final rules have been given sufficient consideration. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1324 (D.C.Cir.1988) ("we cannot say with certainty whether petitioner's comments would have had some effect if they had been considered when the issue was open").

Because the EPA has not provided adequate notice and opportunity for comment, we conclude that the mixture and derived-from rules must be set aside and remanded to the EPA. In light of the dangers that may be posed by a discontinuity in the regulation of hazardous wastes, however, the agency may wish to consider reenacting the rules, in whole or part, on an interim basis under the "good cause" exemption of 5 U.S.C. § 553(b)(3)(B) pending full notice and opportunity for comment. *See, e.g., Mid-Tex Elec. Co-op., Inc. v. FERC*, 822 F.2d 1123, 1131–34 (D.C.Cir.1987).

As we vacate them on procedural grounds, we do not reach petitioners' argument that the mixture and derived-from rules unlawfully expand the EPA's jurisdiction under Subtitle C of RCRA.

## C. Treatment

The American Mining Congress ("AMC")[5] challenges the EPA's regulatory

---

**5.** The American Iron and Steel Institute and the American Petroleum Institute join the AMC in

this challenge.

definition of the term "treatment." In its proposed regulations, the EPA adopted RCRA's definition of "treatment" as

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amendable [sic] for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous.

42 U.S.C. § 6903(34) (1976); *see* 43 Fed. Reg. 58,955, 58,976, and 58,996 (proposed 40 C.F.R. §§ 250.11(a)(11), 250.21(a)(12), and 250.41(a)(15)). In its final rules, however, the EPA expanded the definition to include

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or *so as to recover energy or material resources from the waste,* or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.

45 Fed.Reg. 33,076 (40 C.F.R. § 260.10(73)) (emphasis added). The AMC contends that in promulgating the expanded definition, the EPA exceeded its statutory authority by including resource recovery and failed to afford interested parties adequate notice and opportunity to comment. The EPA grounds its authority for regulating resource recovery in the statutory definition of treatment and, more broadly, in its Subtitle C authority to manage hazardous wastes from their generation until after their disposal. Because we are persuaded that Subtitle C provides broad authority for regulating the management of hazardous waste and does not prohibit the regulation of resource recovery from hazardous

wastes, we deny the AMC's petition. We also reject its argument that the regulations were promulgated without sufficient notice and opportunity for comment.

### 1. *Chevron*

 In reviewing the EPA's interpretation of the governing statute, we first determine, by applying traditional rules of statutory interpretation, "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781–82. "[I]f the statute is silent or ambiguous with respect to the specific issue," however, we must sustain the agency's construction of the statute so long as it is permissible. *Id.* at 843, 104 S.Ct. at 2781. Our initial task, then, is to decide whether Congress excluded resource recovery from the statutory scheme of regulation of hazardous wastes. We conclude that it did not.

### 2. *Analysis*

The AMC launches a powerful attack on EPA's reliance on the statutory definition of treatment as the source of its authority to regulate resource recovery from hazardous wastes. We agree that the statutory language will not bear the weight put on it by the EPA. The statutory definition states what "treatment" *means,* as opposed to what it *includes.* Thus, while the statute lists the types of activities that can constitute treatment, a "method, technique, or process" is treatment only if it is designed to change the character or composition of wastes to achieve one of the definition's enumerated purposes. These purposes include processes designed to render waste safer and more amenable for recovery, for example, but does not mention the regulation of resource recovery. Moreover, while the definition includes processes designed to "render ... waste ... safer for transport," it excludes transporting the waste; and while it includes pro-

cesses designed to "render ... waste ... amenable for storage," it excludes storing the waste. Thus, we conclude that the definition does not provide explicit authority for the regulation of resource recovery from hazardous wastes.

This, however, does not end our inquiry. The EPA also argues that its authority to regulate resource recovery is inherent in its statutory mandate to manage hazardous wastes. *See* 45 Fed.Reg. 33,091–92. Subtitle C creates a "cradle-to-grave" regulatory system in which the EPA is charged with the responsibility for managing hazardous waste. *See* 42 U.S.C. §§ 6921–31 (1976); *see also American Petroleum Inst. v. EPA*, 906 F.2d 729, 732–33 (D.C.Cir.1990) (*"API"*). RCRA broadly defines "hazardous waste management" as "the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes." 42 U.S.C. § 6903(7).

In interpreting the Act, we have made clear that the linchpins of the Subtitle C system are the definitions of "hazardous waste" and "solid waste." Only materials that meet both definitions will come within the "cradle-to-grave" regulatory scheme. *AMC I*, 824 F.2d at 1179; *API*, 906 F.2d at 733 ("Once a waste is listed or identified as hazardous, its subsequent management is regulated."). Under these definitions, a substance is not classified as waste, whether hazardous or not, until it has been discarded. *See* 42 U.S.C. § 6903(27); *AMC I*, 824 F.2d at 1190; compare *American Mining Congress v. EPA*, 907 F.2d 1179, 1185–87 (D.C.Cir.1990) (*"AMC II"*) (although EPA may not classify as "discarded" materials that are "destined for beneficial reuse or recycling in a continuous process by the generating industry itself," it may treat sludges held in wastewater treatment surface impoundments as "discarded" despite prospect of later resource recovery). At that point, if it is hazardous, it falls within the jurisdiction of the EPA, which is then responsible for its management until such time as it ceases to pose a hazard to the public.

As we have noted elsewhere, the creation of a "framework for a national system to insure the safe management of hazardous waste" was "Congress' overriding concern in enacting RCRA." *AMC I*, 824 F.2d at 1179 (internal quotation marks omitted). Thus, Congress specifically found that

hazardous waste presents, in addition to the problems associated with non-hazardous solid waste, special dangers to health and requires a greater degree of regulation than does non-hazardous solid waste.

42 U.S.C. § 6901(b)(5) (1976). To fulfill this mandate, Congress granted the EPA, in Subtitle C, the specific authority to: (1) promulgate criteria for identifying characteristics of hazardous waste and for listing such wastes, 42 U.S.C. § 6921; (2) set out standards applicable to generators of hazardous waste, *id.* § 6922; (3) create standards applicable to transporters of hazardous wastes, *id.* § 6923; and (4) set out standards and design permit requirements for facilities that treat, store, or dispose of hazardous waste, *id.* §§ 6924–25.

The statute established a separate regime outside of Subtitle C for the recovery of resources from solid wastes. Subtitle D of RCRA, 42 U.S.C. §§ 6941–49, seeks "to assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound and which maximize the utilization of valuable resources and to encourage resource conservation." *Id.* § 6941 (1976). Resource recovery is treated as a means to control and manage solid wastes, but not hazardous wastes. The fostering of resource recovery falls in the first instance to the States for inclusion in solid waste management plans. *See, e.g., id.* §§ 6941, 6942(c)(10), 6943(6).

Although RCRA addresses resource recovery from nonhazardous solid wastes, it is silent as to how the extraction of any recoverable value is to be handled once a material falls within the EPA's exclusive jurisdiction as hazardous waste. Yet, one purpose of the statute is to conserve useful resources, *see id.* §§ 6902(1) and (7), and such recovery may be incident to the management of hazardous wastes.

Thus, we are faced with the question of whether the absence of the words "resource recovery" from the statutory definition of "treatment," and the absence of any specific discussion of resource recovery in Subtitle C, requires the EPA to recede from its clear regulatory role in the management of hazardous wastes during periods when useable resources are being salvaged from them. The EPA believes the answer is self-evident: Once hazardous solids are discarded, it becomes the EPA's responsibility, through regulation, to manage them in the public interest. The Agency concluded that RCRA does not permit such an exception from the comprehensive management system created by Subtitle C.

The EPA insists that to assert otherwise, to assert that hazardous materials may be removed from this "cradle-to-grave" regulatory system whenever resources are recovered from hazardous wastes, would create a paradoxical system. Such wastes would be subject to manifesting requirements and transportation restrictions, and could be subject to permitting requirements if sent to a treatment, disposal, or storage facility, but would not be subject to any regulatory safeguards if sent to a resource recovery facility. Yet, resource recovery and recycling activities pose the same kinds of dangers that treatment and storage do. *See* 45 Fed.Reg. 33,091; 48 Fed.Reg. 14,505–07 (1983) (examples of accidents involving recycling of hazardous wastes). As the EPA noted in promulgating the final rules, such a system could significantly undermine the entire regulatory structure. Excluding resource recovery from hazardous wastes from Subtitle C jurisdiction

would make the regulatory program largely unworkable and create a major regulatory loophole not intended by the Act. Without a manifest system (or its functional equivalent) there would be no way of assuring that wastes which were intended to be used, re-used, recycled or reclaimed were in fact delivered to their intended destination. Whether a waste was subject to Subtitle C requirements would be based primarily on the intent of the person handling it.

45 Fed.Reg. 33,091.

Under *Chevron,* if we determine that Congress has not spoken to the precise question at issue, we

must assume that Congress implicitly delegated to the agency the power to make policy choices that represent[ ] a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.

*Ohio v. Dep't of the Interior,* 880 F.2d 432, 441 (D.C.Cir.1989) (quoting *Chevron,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83 (internal quotation marks omitted)). Although Subtitle C is silent on the question of resource recovery from hazardous waste, its structure and its broad grant of authority to the EPA to manage the problem of hazardous waste make it unclear, at the very least, whether Congress intended to exempt resource recovery from what is otherwise a comprehensive mandate to regulate hazardous wastes. Therefore, we cannot say that Congress has spoken to the precise issue before us.

Under such circumstances, *Chevron* requires us to defer to the EPA's construction of its authority under Subtitle C so long as it "is reasonable and consistent with the statutory purpose." *Ohio v. Dep't of the Interior,* 880 F.2d at 441. As Subtitle C, read as a whole, provides broad authority to the EPA to fashion rules to govern the management of hazardous wastes, it would seem entirely reasonable for the EPA to conclude that it has the authority to regulate the extraction of resources from the wastes committed to its care.

Nevertheless, the AMC relies specifically on our decision in *AMC I* to argue that the EPA does not have authority to regulate resource recovery from hazardous wastes because the recovery occurs within the industrial process. In *AMC I,* however, we held that secondary materials that are "destined for immediate reuse in another phase of the industry's ongoing process ... have not yet become part of the waste disposal problem" and therefore are not

solid wastes. *AMC I*, 824 F.2d at 1185–86; *compare AMC II*, 907 F.2d at 1185–87. *AMC I* does not affect in any way the EPA's ability to regulate hazardous materials after they have been discarded. *See* 42 U.S.C. § 6903(27) (defining "solid waste" as "discarded material ... resulting from industrial [and other] activities").

■ Indeed, our subsequent holding in *API* strongly suggests that hazardous wastes sent to reclamation facilities fall within the scope of Subtitle C regulation. In *API*, we rejected the EPA's view that the definition of solid waste, and our decision in *AMC I*, barred the regulation of K061 slag sent to a reclamation facility. The EPA believed that because the slag was sent to a reclamation facility, it could not be considered "discarded" and thus was not a solid waste. We rejected that reading of *AMC I* as too broad and remanded for reconsideration. We noted that "it appears unlikely that EPA can simply readopt the conclusion that its authority to regulate K061 ends at the door of the reclamation facility. To reach such a conclusion, EPA would have to reconcile this position with the RCRA's acknowledged objective to establish[ ] a cradle-to-grave regulatory structure for the safe handling of hazardous wastes." *API*, 906 F.2d at 741 (quoting *United Technologies Corp. v. EPA*, 821 F.2d 714, 716 (D.C.Cir.1987) (internal quotation marks omitted)). We believe the EPA has correctly resolved part of the *API* court's challenge: If a hazardous material has been discarded, it becomes subject to Subtitle C regulation even if it is sent to a resource recovery facility.

Given the structure of Subtitle C and the power delegated to the EPA, we find the Agency's regulation of resource recovery from hazardous wastes to be permissible under RCRA. Further, we believe the EPA acted reasonably in incorporating resource recovery within the regulatory definition of treatment. *See* 45 Fed.Reg. 33,-091–92. *See also API*, 906 F.2d at 740–41 n. 15 (reference to use of metal reclamation facilities "to treat discarded hazardous wastes"). Thus, we deny the AMC's petition challenging the EPA's authority to regulate resource recovery.

### 3. *Notice and Comment*

■ The AMC also contends that the EPA included resource recovery within the purview of Subtitle C without providing adequate notice and opportunity for comment. We disagree. The EPA's initial Notice of Intent to Develop Rulemaking, 42 Fed.Reg. 9,803, stated that the rulemaking would address "the recovery and reuse of ... discarded materials as well as ... the careful management of all hazardous wastes." The preamble to the proposed regulations mirrored this statement of purpose, noting that the structure to be created would "establish a comprehensive system designed to safely dispose of, treat, store or reuse hazardous waste." 43 Fed. Reg. 58,947.

More specifically, the phrase "other discarded material" in the statutory definition of solid waste was defined in the EPA's proposed regulations, in part, as

> any material which: (1) Is not re-used (that is, is abandoned or committed to final disposition) or, (2) Is re-used (including materials treated prior to re-use) (i) If such re-use constitutes disposal (as defined in the Act), ...

43 Fed.Reg. 58,954 (proposed C.F.R. § 250.-10(b)). In analyzing this proposed definition, the EPA explained that used materials sent to reclamation facilities would be subject to Subtitle C only if they were hazardous wastes. *Id.* 58,950. Further, the EPA noted that "[o]ther materials and their uses will be included by amendment to this list upon a finding by the EPA that it is necessary to control such uses." *Id.* 58,954.

Background documents circulated by the EPA prior to the promulgation of the final rules also addressed the regulation of resource recovery and re-use of hazardous waste. In one, the Agency compared "treatment" to "disposal":

> While safe techniques for land disposal (e.g. landfilling) can protect public health and the environment, land disposal waste management options generally do not provide opportunities for resource con-

servation or recovery.... In contract [sic], waste treatment options, such as incineration and chemical/physical/biological treatment, can destroy hazardous waste (or render it non-hazardous) once and for all, while providing the potential for energy and/or material recovery at the same time.... Also, the public is more likely to accept a treatment/recovery facility than a land disposal facility.

EPA, Background Document D-623 at 2 (1978), *reprinted in* J.A. at 101. This reflects the Agency's view that resource recovery is a form of treatment.

The EPA argues that even if the preambles, the explanation of the solid waste definition, and the background document did not make clear its intention to regulate resource recovery, such regulation was a logical outgrowth of these discussions. Certainly, interested parties who filed comments recognized that the EPA viewed resource recovery as within its Subtitle C jurisdiction. The comments detailed in the final rules show a recognition that the EPA contemplated regulation of resource recovery. *See* 45 Fed.Reg. 33,091-92. Thus, unlike its argument regarding the mixture and derived-from rules, the EPA does not locate notice in these comments but adduces them to show the adequacy of notice.

The EPA's proposed regulations, explanation, and background documents reflect that it considered resource recovery to be within the scope of Subtitle C. These materials also suggest, although they do not conclusively state, that the EPA considered resource recovery as a form of treatment. The specific inclusion of resource recovery within the "cradle-to-grave" system appears to be a logical outgrowth of these statements. *Small Refiner*, 705 F.2d at 546-47. We therefore reject the AMC's petition to remand these regulations for notice and comment.

D. Leachate Monitoring

■ The American Petroleum Institute ("API") challenges the EPA's interim final rule requiring that land treatment facilities perform leachate monitoring. *See* 45 Fed. Reg. 33,248 (40 C.F.R. § 265.278(b)(2)).[6] It contends that the EPA promulgated the rule without affording interested parties the notice and opportunity to comment that the APA requires. *See* 5 U.S.C. § 553 (1988). We agree.

RCRA requires the EPA to issue performance standards for owners and operators of hazardous waste treatment, storage, and disposal facilities. *See* 42 U.S.C. § 6924 (1976). Pursuant to that obligation, the EPA proposed monitoring requirements for three types of waste facilities: landfills ("disposal facilit[ies] ... where hazardous waste is placed in or on land," 45 Fed.Reg. 33,075 (40 C.F.R. § 260.10)); surface impoundments ("natural topographic depression[s], man-made excavation[s], or diked area[s] ... designed to hold an accumulation of liquid wastes or wastes containing free liquids," *id.*); and land treatment facilities (facilities "at which hazardous waste is applied onto or incorporated into the soil surface," *id.*). *See* 43 Fed.Reg. 58,986, 59,-005 (proposed 40 C.F.R. § 250.43-8) (landfills and surface impoundments); and *id.* 58,990, 59,014 (proposed 40 C.F.R. § 250.-45-5(e)) (land treatment facilities).

The EPA proposed groundwater and leachate monitoring requirements for both landfills and surface impoundment facilities. *See* 43 Fed.Reg. 59,005-06 (proposed 40 C.F.R. § 250.43-8). Groundwater monitoring involves the analysis of water quality in the earth's saturated zone, *see id.* 58,997 (proposed 40 C.F.R. § 250.41(38)), i.e., "that part of the earth's crust in which all voids are filled with water," *id.* 58,998 (proposed 40 C.F.R. § 250.41(76)). Leachate monitoring, on the other hand, requires the analysis of water quality in the earth's unsaturated zone (zone of aeration), *see id.* 58,997 (proposed 40 C.F.R. § 250.41(51)), i.e., "the zone between the land surface and the nearest saturated zone, in which the interstices are occupied partially by air,"

---

**6.** The proposed regulations referred to land treatment facilities as "landfarms," *see* 43 Fed. Reg. 58,990. The EPA adopted the term "land treatment facility" in the final rules. *See* 45 Fed.Reg. 33,205.

*id.* 58,999 (proposed 40 C.F.R. § 250.-41(93)).

Although it recognized that the "technology of leachate monitoring [was] still being refined," *id.* 58,986, the EPA defended its proposed requirement as an important means of "provid[ing] an early warning that groundwater contamination may occur." *Id.* According to the Agency, "[g]roundwater monitoring alone does not sufficiently protect the environment because the leak must move through and cause extensive contamination of the [unsaturated zone] before it reaches and contaminates the groundwater." *Id.*

### 1. *Proposed Regulations*

The proposed regulations discussed monitoring requirements for land treatment facilities separately, and specified the use of soil coring. *See* 43 Fed.Reg. 59,014 (proposed 40 C.F.R. § 250.45–5(e)). Like leachate monitoring, soil-core monitoring examines soil in the unsaturated zone. But while leachate monitoring detects waste contaminants passing through the soil, soil-core monitoring detects those that remain in the soil. *See* 45 Fed.Reg. 33,207. The EPA also requested comments on, but did not propose, a groundwater monitoring requirement at land treatment facilities. 43 Fed.Reg. 58,990. Groundwater monitoring would probably be unnecessary, the EPA explained, because "soil monitoring will detect [hazardous waste] migration long before groundwater is threatened." *Id.*

### 2. *Final Rules*

The final rules required only groundwater monitoring at landfills and surface impoundments. *See* 45 Fed.Reg. 33,239–40 (40 C.F.R. § 265.90). Unlike the proposed regulations, they did not require leachate monitoring at these facilities because of the "technical problems" associated with its implementation. *Id.* 33,191. According to the EPA,

> [a]vailable leachate monitoring technology generally involves the placement of probes (lysimeters) beneath the disposal facility. Since each probe is not generally capable of monitoring a large area,

many of them would have to be placed under a facility in order to detect a localized flaw in the landfill design. It may not be possible to place such devices below an existing landfill or surface impoundment without completely removing the waste and redesigning the facility. Moreover, once such a system is in place, the probes tend to fail over time due to deterioration or plugging. It is difficult to determine when such a failure occurs and, if discovered, the damage is generally irreparable.

*Id.*

In contrast, the final rules required that land treatment facilities utilize soil-core and leachate, as well as groundwater, monitoring systems. *See* 45 Fed.Reg. 33,239–40 (40 C.F.R. § 265.90), and 33,248 (40 C.F.R. § 265.278). According to the EPA, all three testing systems were necessary "to accurately determine whether the complex processes involved in land treatment are, in fact, occurring, and whether contaminants are migrating to ground water." *Id.* 33,-207. The EPA explained that it was requiring both types of unsaturated zone monitoring because they perform complementary functions:

> Soil core monitoring is useful in determining the extent to which the hazardous wastes are being attenuated and broken down in the soil. [Leachate] monitoring is a necessary complementary or back-up system to assure that the absence of a hazardous waste constituent in the soil core sample indicates a breakdown of the waste rather than merely the rapid migration of the waste material through the soil matrix.

*Id.* The EPA also explained why leachate monitoring was required at land treatment facilities, despite its rejection of such a requirement for landfills and surface impoundments:

> [Leachate] monitoring is more easily achieved at land treatment sites than at landfills or surface impoundments. Lysimeters or similar devices which measure [leachate] contamination can be installed at land treatment facilities in the area where waste has been applied. The

relatively shallow depth of waste application at land treatment facilities allows lysimeters to be replaced, at both existing and new facilities, when they become clogged or otherwise nonfunctional. Furthermore, land treatment facilities typically do not have liners which would interfere with the placement of lysimeters.

*Id.*

Beginning on July 18, 1980, the API submitted a series of post-promulgation comments criticizing the final rule's leachate monitoring requirement for land treatment facilities. *See* Appendix to Reply Brief for Petitioner API. The API argued that leachate monitoring was unnecessary for land treatment of petroleum wastes. *See id.* at A–3 and A–4. It also identified a number of problems associated with the use of lysimeters at land treatment facilities:

1) The top of the lysimeter pipe will project above the ground and form an obstacle to efficient tilling and spreading of waste. A high probability of physical damage to the spreading equipment and to the lysimeters will exist. Even buried lysimeters are subject to damage from the plowing operation[;]

2) Consulting firms with experience in the area report problems with use of lysimeters such as frequent plugging and surface water infiltration down the outside of the pipe[;]

3) Even though it is possible to replace lysimeters when they become plugged or damaged, there may be little justification under many circumstances for the continuing expense of replacement.

*Id.* at A–4 and A–5. The EPA neither responded to these comments nor modified the interim final rule.

### 3. *Adequacy of Notice*

As we explained in our discussion of the mixture and derived-from rules, when a final rule bears little resemblance to the one proposed, the parties are deprived of their APA rights to notice and comment. *See Small Refiner,* 705 F.2d at 547. When a final rule is a logical outgrowth of the proposal, on the other hand, the APA's

notice-and-comment provisions are satisfied, and procedural challenges based thereon must fail. *Id.* "[T]he test, imperfectly captured in the phrase 'logical outgrowth,'" *id.* at 548–49, is whether parties "should have anticipated" leachate monitoring at land treatment facilities. *Id.* at 549.

In its proposed regulations, the EPA explained that it was considering a leachate monitoring requirement for surface impoundments and landfills, even though the relevant technology was still evolving. *See* 43 Fed.Reg. 58,986. It also made clear, however, that its proposals for surface impoundments and landfills did not apply to land treatment facilities: In the Agency's words, "[m]onitoring at [land treatment facilities] is treated separately." *Id.* In the separate section discussing these facilities, the EPA indicated that it would require soil-core monitoring but not groundwater monitoring. While it asked for comments on whether groundwater monitoring would be desirable at land treatment facilities, *id.* 58,990, the EPA did not mention leachate monitoring anywhere in the section.

We conclude that the EPA did not adequately forewarn parties that leachate monitoring might be imposed. As both the proposed regulations and final rules reveal, the three types of proposed monitoring requirements are quite different: Leachate and groundwater monitoring test different subterranean zones (unsaturated and saturated, respectively), and soil-core and leachate monitoring perform different analyses within the same zone. A proposal to require one type of monitoring does not imply an intent to require another; nor does a proposal to require one kind of monitoring at landfills and surface impoundments imply an intent to require that same kind at land treatment facilities.

In contrast to surface impoundments and landfills, which are enclosed facilities designed primarily to contain hazardous waste, *see* 45 Fed.Reg. 33,202; 33,209–10, land treatment facilities use soil as a medium to treat the waste and typically lack liner systems. *Id.* 33,205. As a consequence, land treatment facilities likely pose different environmental hazards than do

landfills and surface impoundments and, as the final rules suggest, may also require different monitoring systems. The problem here, however, is that interested parties had no notice that one of these systems might be leachate monitoring.

The EPA nevertheless purports to find adequate notice in various parts of the proposed regulations. It points, first, to two passages in its discussion of land treatment facilities: the request for comments on "whether groundwater monitoring is desirable at [land treatment facilities]," as well as on *"all aspects of the soil monitoring requirements,"* 43 Fed.Reg. 58,990 (emphasis added); and the request for comments on the "adequacy, statistical or otherwise, of the number, depth, and frequency of soil cores required" and for *"[s]uggestions for alternate approaches," id.* (emphasis added). Read in context, however, the highlighted passages assume a different meaning:

> The [land treatment] regulations require extensive soil monitoring to detect and provide time for preventing the migration of hazardous waste below the zone of incorporation, i.e., the depth to which the soil on a [land treatment site] is plowed or tilled to receive waste. Because soil monitoring will detect migration long before groundwater is threatened, groundwater monitoring is not required.... The Agency requests comment on whether groundwater monitoring is desirable at [land treatment facilities], and if so, why.

> Soil conditions at a [land treatment facility] are determined by soil monitoring. Soil monitoring consists of taking core samples, sample analysis, and statistical comparison of analytical results to previously established background soil conditions.... *Comments are requested on all aspects of the soil monitoring requirements.* Specific information is needed on the adequacy, statistical or otherwise, of the number, depth, and frequency of soil cores required. *Sugges-*

*tions for alternate approaches are requested,* e.g., a formula for the number of cores to be taken per unit area, based on [the facility's] size and representative soil types.

*Id.* (emphases added). The requests for comments "on all aspects of the soil monitoring requirements" and "alternate approaches," therefore, were designed to solicit suggestions on all *aspects* of soil-core monitoring, but not on alternatives *to* soil coring, such as leachate monitoring.

Next, the EPA argues that although it failed specifically to propose leachate monitoring for active land treatment facilities, it did propose leachate monitoring for these facilities after closure.[7] *See* 43 Fed.Reg. 59,005 (proposed 40 C.F.R. §§ 250.43–7(n)(1), 250.43–8(c)(2) and (3)). The EPA asserts that as interested parties had ample opportunity to respond to this proposal, they cannot now complain that their procedural rights have been violated. A closed land treatment facility, which by definition no longer involves active treatment operations, likely poses different technical barriers to leachate monitoring than does an active facility. Indeed, the API objects to leachate monitoring, in part, because moving plows would damage protruding lysimeters, a problem that would not arise after closure. *See* Reply Brief for Petitioner API at 8. Comments on the post-closure requirements, then, did not encompass all relevant objections to the same requirements at active facilities.

The EPA further argues that even if it did not provide adequate notice, the final rule was a "logical outgrowth" of the *comments* received. As we have already observed, the EPA "cannot bootstrap notice from a comment." *Small Refiner,* 705 F.2d at 549; *see also McLouth Steel Prods. Corp.,* 838 F.2d at 1323 ("Because the notice was inadequate, EPA's consideration of the comments received in response thereto, no matter how careful, cannot cure the defect." (Citation omitted)). This

7. "[C]losure is the period after closeout during which treatment, storage, and disposal operations are completed, final cover is applied to landfills, and equipment is dismantled and de-

contaminated." 43 Fed.Reg. 58,985. "Post-closure is the period after closure during which certain monitoring and maintenance must be conducted." *Id.* 58,986.

court has explained that a contrary rule "would turn notice into an elaborate treasure hunt, in which interested parties, assisted by high-priced guides (called 'lawyers'), must search the record for the buried treasure of a possibly relevant comment." *Small Refiner*, 705 F.2d at 550.

Even if the EPA could bootstrap notice from a comment, it has failed to identify any comments from which to do so. Instead, the Agency relies on a general reference in the preamble to the interim final rule:

> The proposed interim status standards required ground-water and leachate monitoring at landfills and surface impoundments where one or both of these monitoring systems were already in place. Several commenters suggested requiring ground-water and leachate monitoring at *all* facilities during interim status, whether or not such systems were already in place. They felt that exempting some sites from conducting this monitoring would mean that local and State implementing authorities would be deprived of the warning needed to determine if sites are endangering ground water and local water supplies. Further, some of the commenters stated that the ground-water monitoring systems must be installed at all facilities that receive permits. They felt that EPA should not postpone monitoring until the final permit was issued, because that could take five years or longer.

45 Fed.Reg. 33,160. We understand this passage to mean only that some comments filed with the Agency had supported a leachate monitoring requirement for all landfills and surface impoundments.

The only other comments the EPA cites are observations that soil-core monitoring of the unsaturated zone would not detect organic compounds migrating rapidly through the soil. *See* 45 Fed.Reg. 33,206. Though these comments provide a technical justification for requiring both leachate and groundwater monitoring, their authors recommended only groundwater monitoring. *See id.* 33,206–07. Indeed, the EPA has failed to identify even one comment recommending (or opposing) leachate monitoring at land treatment facilities. Instead of supporting the EPA's argument, then, the cited comments reinforce our conclusion that notice was inadequate.

Finally, the EPA asserts that it "carefully reviewed each possible impediment [to imposing leachate monitoring at land treatment facilities], and reasonably concluded that none presented an obstacle." Brief for Respondent at 95. It argues, further, that as the API's post-promulgation comments do not identify any "technical problems" that "materially differ from those already considered and rejected, ... it is difficult to see how [the] API could raise on remand 'new and different criticisms which the Agency might find convincing.' " *Id.* (citation and emphasis omitted). As we noted in our discussion of the mixture and derived-from rules, however, the Agency has completely failed to comply with the APA's notice-and-comment requirements and thus cannot demand that the API show prejudice. Furthermore, the API has already submitted numerous comments, including comments that relate specifically to leachate monitoring at land treatment facilities, to which it has received no response. Because the EPA has failed to demonstrate that it received *any* relevant pre-promulgation comments, its claim that it can learn nothing new on remand is unacceptable.

## E. Permit–Shield Provision

The Environmental Defense Fund ("EDF") challenges the EPA's "permit as shield" provision that, with some exceptions, protects holders of RCRA permits from enforcement actions for violations of the underlying statute.[8] The provision currently reads:

> Compliance with an RCRA permit during its term constitutes compliance for purpose of enforcement, with Subtitle C of

---

**8.** The EPA argues that the EDF's claim is not properly before this court. *See* Brief for Respondent at 96–97 n. 82. A panel of this court has already rejected the EPA's argument, how-

ever, *see* Order Denying Motion to Strike Brief and to Dismiss Petition for Review, *Shell Oil Co. v. EPA*, No. 80–1532 (Dec. 4, 1989), and we abide by that decision.

RCRA except for those requirements not included in the permit which become effective by statute, or which are promulgated under Part 268 of this chapter restricting the placement of hazardous wastes in or on the land. However, a permit may be modified, revoked and reissued, or terminated during its term for cause as set forth in §§ 270.41 and 270.43, or the permit may be modified upon the request of the permittee as set forth in § 270.42.

40 C.F.R. § 270.4(a) (1990).[9] The EDF argues that by insulating permittees from most enforcement actions, the permit-shield provision expressly contravenes the broad enforcement authority that RCRA grants to members of the general public in its citizen-suit provision, *see* 42 U.S.C. § 6972(a) (1988), and to the EPA in various other provisions, *see id.* §§ 6928(a), 6928(d). In the alternative, the EDF argues that the provision unreasonably curtails the EPA's enforcement powers.[10] We conclude that the EDF's citizen-suit challenge does not present a case or controversy requiring resolution, and its remaining challenges lack merit.

### 1. *Statutory and Regulatory Background*

RCRA requires owners and operators of hazardous waste treatment, storage, or disposal facilities to obtain a permit before commencing operations. 42 U.S.C. § 6925(a) (1988). Permits are valid for ten years, although permits for land disposal facilities are reviewed every five years. *Id.* § 6925(c)(3). Before granting a permit, the EPA must determine that the facility meets the requirements of 42 U.S.C. § 6924 and its implementing regulations. *Id.* § 6925(c)(1). These include any performance standards the EPA deems necessary to "protect human health and the environment." *Id.* § 6924(a).

The EPA promulgated the original version of the permit-shield provision in its 1980 base regulations. 45 Fed.Reg. 33,428 (40 C.F.R. § 122.13(a)). The EPA described the permit-shield rule as a binding principle under which it "will not take enforcement action against any person who has received a final RCRA permit except for noncompliance with the conditions of that permit." *Id.* 33,312. According to the Agency, the shield applies not only to the EPA enforcement actions, but also to enforcement actions brought by States and by citizens through RCRA's citizen-suit provision. *Id.* Although the permit-shield rule lacks explicit statutory authorization, the Agency asserts that the rule furthers the objectives of the RCRA permit program by protecting owners and operators of waste facilities against otherwise "unavoidable uncertainty as to the standing of their operations under the law," *id.*, and by conserving agency resources, which would be "barely sufficient to issue and renew RCRA permits, and review State permits." *Id.*

### 2. *Conflict with Citizen–Suit Provision*

The EDF first challenges the permit-shield provision on the ground that it conflicts with RCRA's citizen-suit provision, which states:

> Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf—
>
> > (1)(A) against any person ... who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter....

42 U.S.C. § 6972(a)(1)(A) (1988). The EDF contends that by restricting citizens to enforcement actions based on permit violations, the permit-shield provision expressly contravenes the statute's broad grant of

---

**9.** The EPA promulgated the original permit-shield rule in 1980. *See* 45 Fed.Reg. 33,428 (40 C.F.R. § 122.13(a)). The rule has since been recodified once, *see* 48 Fed.Reg. 14,232–33 (Apr. 1, 1983) (40 C.F.R. § 270.4(a)), and amended twice, *see* 52 Fed.Reg. 45,799 (Dec. 1, 1987), 53 Fed.Reg. 37,935 (Sept. 28, 1988).

**10.** The EDF also argues that in promulgating the shield provision, the EPA acted arbitrarily and capriciously because it failed to make the findings necessary to create an estoppel against the government. Because this argument is frivolous, we do not address it.

authority to citizens to enforce violations of any "standard, regulation, condition, requirement, prohibition, or order." *Id.* Because "Congress has directly spoken to the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781, the EDF concludes that this court must strike down the inconsistent permit-shield provision insofar as it limits citizens' enforcement authority.

We do not decide the merits of the EDF's challenge. The EPA represents that although it believes its permit system will narrow the opportunities for citizen suits, "the Agency does not maintain that the shield precludes [such] suits." Brief for Respondent at 109. Although the EPA appears to have taken a different position when it first promulgated the rule, *see* 45 Fed.Reg. 33,312, it has evidently changed its mind. Therefore, as we do not have an actual controversy before us, we do not decide whether the permit provision could lawfully bar "citizen suits." *See Deakins v. Monaghan,* 484 U.S. 193, 199, 108 S.Ct. 523, 527, 98 L.Ed.2d 529 (1988) ("Article III of the Constitution limits federal courts to the adjudication of actual, ongoing controversies....").

### 3. *Conflict with EPA's Enforcement Authority*

■ The parties dispute whether Congress has directly spoken to the question whether the EPA can limit its own enforcement actions to violations of permits, and, if not, whether the EPA nonetheless acted unreasonably by issuing the permit-shield rule.

The EDF argues that RCRA requires the EPA to do more than simply enforce permit provisions:

> [W]henever ... the Administrator determines that any person has violated or is in violation of *any* requirement of [RCRA Subtitle C], the Administrator may issue an order assessing a civil penalty for any past or current violation, requiring compliance ... or the Administrator may commence a civil action....

42 U.S.C. § 6928(a)(1) (1988) (emphasis added). According to the EDF, Congress's use of the broad phrase "any requirement" demonstrates that it intended the EPA to bring enforcement actions for all violations of RCRA's standards, even when those standards are not incorporated into a permit. The EDF points out that Congress used narrower language in RCRA's criminal enforcement provisions, which authorize criminal sanctions against any person who "knowingly treats, stores, or disposes of any hazardous waste ... in knowing violation of any material condition or requirement of [a] permit." *Id.* § 6928(d)(2)(B). As courts should "give effect, if possible, to every word that Congress has used in a statute," *Connecticut Dep't of Income Maintenance v. Heckler,* 471 U.S. 524, 530 n. 15, 105 S.Ct. 2210, 2213 n. 15, 85 L.Ed.2d 577 (1985), the EDF concludes, the shield provision must fall.

■ The EDF's *Chevron I* argument is unavailing. Although the provision authorizes the EPA to enforce violations of "any requirement," it does not require that the EPA do so. On the contrary, the provision's use of the permissive word "may" guarantees the EPA's discretion in the civil enforcement arena. *See Lo Shippers Action Committee v. ICC,* 857 F.2d 802, 806 (D.C.Cir.1988) ("may" indicates the presence of regulatory discretion), *cert. denied,* 490 U.S. 1089, 109 S.Ct. 2429, 104 L.Ed.2d 986 (1989). Thus, as no other provision in RCRA even arguably addresses the question whether permit compliance can shield a permit-holder from EPA enforcement actions, we will strike down the permit-shield provision only if it is an unreasonable construction of the statute. *See Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783.

The Supreme Court pointed out in *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), that agencies are generally free to set their own enforcement agendas. In the Court's words, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831, 105 S.Ct. at 1655. The Court noted that agency discretion with respect to enforce-

ment decisions is generally desirable because

an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.

*Id.* In short, in its view, "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32, 105 S.Ct. at 1655–56.

The Court adds, however, that

Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue.

*Id.* at 833, 105 S.Ct. at 1656. Here, as we indicated in rejecting EDF's argument that the plain language of the statute required us to set the shield provision aside, we see no congressional constraints on the EPA's exercise of enforcement discretion.

*Chaney* is not directly on point because there the agency had refused to take enforcement action in a single case. Here, by contrast, the EPA has announced, through rulemaking, that it will not take enforcement actions in a whole class of cases. For purposes of determining the reviewability of agency action, this distinction might make a difference,[11] but for purposes of determining the reasonableness of the permit-shield rule, the policies underlying *Chaney* retain persuasive force.

We note in particular that the decision-making process that led to promulgation of the permit-shield provision involves the same "ordering of priorities" that the Supreme Court described in *Chaney.* The EPA has decided that the most efficient and effective way to pursue an enforcement strategy is to place all of the relevant RCRA requirements in a single permit for each permittee and then to focus its enforcement efforts solely on compliance with those permits. In arriving at its decision, the EPA balanced factors such as achieving compliance with all statutory and regulatory requirements, providing permittees with certainty about their legal obligations, and conserving the agency's own overtaxed resources. *See* 45 Fed.Reg. 33,-311–12. At a minimum, then, *Chaney* suggests that rules like the permit-shield provision are presumptively reasonable under the second prong of *Chevron.* *See* 467 U.S. at 845, 104 S.Ct. at 2783.

*Chaney* distinguishes the case where "it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n. 4, 105 S.Ct. at 1656 n. 4 (citing as an example *Adams v. Richardson,* 480 F.2d 1159 (D.C.Cir.1973) (en banc)). The EDF argues that we have such a situation here: If under the shield provision, a permit writer erroneously omits a regulatory or statutory provision from the permit, the holder of the permit will be free to violate RCRA for up to ten years. For its part, the EPA acknowledges that some of the errors in drafting permits will not be corrected during the life of the permit, *see* 45 Fed.Reg. 33,312, but the Agency also argues that the permit-shield provision does not constitute an abdication of statutory responsibilities. We find this argument persuasive.

---

11. *See National Treasury Employees Union v. Horner,* 854 F.2d 490, 496 (D.C.Cir.1988) (noting that rulemaking under the APA "provides a focal point for judicial review—quite unlike the internal agency decisionmaking that precedes decisions not to seek enforcement."); *American Horse Protection Ass'n v. Lyng,* 812 F.2d 1, 4 (D.C.Cir.1987) ("[R]efusals to institute rulemaking proceedings are distinguishable from other sorts of nonenforcement decisions insofar as they are less frequent, more apt to involve legal as opposed to factual analysis, and subject to special formalities, including a public explanation.").

First, the EPA explains that it plans to include all of the applicable statutory requirements in each permit and to enforce each permit fully. RCRA permits are subject to full public notice and comment. 40 C.F.R. §§ 124.10–124.19 (1990). Therefore, members of the public can ensure that proposed permits include all the requisite terms by submitting comments and participating in public hearings, *see id.* §§ 124.10–124.14, and by seeking administrative, *see id.* at § 124.19, and judicial, *see* 42 U.S.C. § 6976(b) (1988), review of each final permit. Next, the EPA points out that it can cure mistakes occurring in final permits by modifying [12] or revoking and reissuing [13] them, or by terminating them if it finds that the permittee misrepresented or failed to disclose material facts in the permit issuance process, *see* 40 C.F.R. § 270.43(a)(2) (1990), or that "the permitted activity endangers human health or the environment and can only be regulated to acceptable levels by permit modification or termination." *Id.* § 270.43(a)(3). Finally, the EPA stresses that the shield provision in no way limits its enforcement authority to respond to instances where the "handling, storage, treatment, transportation or disposal of any solid waste or hazardous waste may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6973(a) (1988).

Notwithstanding the permit-shield provision, then, the EPA retains sufficient flexibility to properly carry out its statutory responsibilities. Moreover, the insulating effect of the provision is limited both in scope and duration. The shield rule does not apply to self-implementing statutory provisions or to the regulatory restrictions on land disposal, and it can only preclude enforcement of standards omitted by mistake for up to ten years, the maximum permit term. We therefore uphold the permit-shield rule as a reasonable, self-imposed constraint on the Agency's enforcement discretion.

### III. CONCLUSION

Because the EPA failed to provide adequate notice and opportunity for comment with regard to the mixture and derived-from rules and with regard to the leachate monitoring requirement, we vacate these rules and remand them to the Agency. We uphold the EPA's definition of "treatment" as consistent with clear congressional intent. Finally, we find the permit-shield regulation, as applied to the enforcement activities of the EPA, to fall within the Agency's discretion under RCRA.

The petitions for review are therefore granted in part and denied in part.

*So ordered.*

---

**12.** The EPA may modify a permit, among other reasons, to account for: material and substantial additions or alterations to the permitted facility or activity; new information that would have justified the inclusion of different conditions at the time of the permit's issuance; or changes in the standards or regulations on which the permit was based. *See* 40 C.F.R. § 270.41(a) (1990).

**13.** The EPA may modify or revoke and reissue a permit if:

(1) Cause exists for termination under § 270.-43, and the Director determines that modification or revocation and reissuance is appropriate.

(2) The Director has received notification (as required in the permit, *see* § 270.30(1)(3)) of a proposed transfer of the permit.

40 C.F.R. § 270.41(b) (1990).