UNITED STATES of America, Plaintiff,

v.

RECTICEL FOAM CORPORATION, a/k/a Foamex L.P., Steve Murphy, Chet Meyers, O.E. "Gene" Fox, Eldon Hall, Jim Van Hooser, and Steve Cansler, Defendants.

Cr. No. 2–92–78.

United States District Court,
E.D. Tennessee,
at Greeneville.

Aug. 10, 1993.

Guy W. Blackwell, Asst. U.S. Atty., Greeneville, TN, Paul S. Rosenzweig, Environmental Crimes Section, Washington, DC, for U.S.

David Eldridge, Charles Fels, Ritchie, Fels & Dillard, Knoxville, TN, Henry Killeen, Harris, Beach & Wilcox, Buffalo, NY, Judson Starr, Venable, Baetjer, Howard & Civiletti, Washington, DC, for Recticel Foam Corp.

Steven Oberman, Daniel & Oberman, Knoxville, TN, for Steve Murphy.

Jerry Laughlin, John Milburn, Greeneville, TN, for Chet Meyers.

Ralph Harwell, Knoxville, TN, for Gene Fox.

Herbert S. Moncier, Knoxville, TN, for Eldon Hall.

Ronald I. Meshbesher, Meshbesher & Spence, Minneapolis, MN, for Jim Van Hooser.

J. Ronnie Greer, Greeneville, TN, for Steve Cansler.

## REPORT AND RECOMMENDATION

MURRIAN, United States Magistrate Judge.

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), for a report and recommendation regarding disposition by the District Court of all dispositive pretrial motions. The motion of defendant, Recticel Foam Corporation ("RFC"), to dismiss counts 1 through 12 on the ground that the materials described in the indictment do not constitute a hazardous waste [Doc. 122] is currently pending before this court. This matter came before the undersigned for an evidentiary hearing on Thursday, July 15, 1993. After considering the evidence presented, the arguments of counsel, and their memoranda of law, the following findings, conclusions and recommendation are made.

## I. UNDISPUTED FACTS

Counts 1 through 12 of the indictment focus on activities at RFC Plant numbers 1 and 3. The following undisputed facts are quoted directly from RFC's brief in support of its motion to dismiss unless otherwise indicated [Doc. 122A].

1. RFC Plant No. 1 produces flexible polyurethane foam slab stock from raw materials, which foam is used in furniture, carpet padding, and other items [Doc. 122A, p. 5].

2. Flexible foam is produced by combining different grades of polyethylene glycol ("polyol") and toluene diisocyanate ("TDI"). These materials, and other chemicals such as flame retardants ... stimulate the chemical reaction and impart various physical characteristics into the foam, such as softness, rigidity, density, and resilience. Methylene chloride or freon was used as a blowing or foaming agent to give the foam its loft or density depending upon the appropriate formulation of the foam. *Id.*

3. During the production process, these foam ingredients were pumped from bulk storage tanks or 55–gallon drums to a continuous mixing head. The mixture of these ingredients was then pumped from the mixing head onto a foaming plate. The material then would begin to foam and flow onto a conveyor, .... The conveyor then took the foam to a cutoff saw, where it was cut to length. *Id.,* at 5–6.

4. The production of foam generated several different process streams, all of which ultimately were collected in barrels located beneath the foam pouring site. The materials in the collection barrels came from three sources:

   a. *Pre–Flush.* [There is no dispute that this process stream is not a hazardous waste and, thus, not a subject of the current indictment.]

   b. *Drainage.* [There is also no dispute that this process stream is not a hazardous waste and, thus, not a subject of the current indictment.]

   c. *Flush.* This process stream, which allegedly constituted [an] F002 listed hazardous waste that is the subject of

the Indictment, is generated after a series of foam pours or at the end of the work day, when the mixing head is cleaned. On a typical day, Plant 1 pours sixty "buns" based on a single foam formulation. Before switching to a different formulation, the mixing head is purged of any foam ingredients by the introduction of additional polyol, methylene chloride, or freon (footnote omitted). These ingredients, including the purged material, are drained into the barrel beneath the foam line, where they are combined with the other process streams from the pre-flush and drainage streams [*id.* at pp. 7–8].

5. RFC Plant No. 3 [ (the "Molded Operation") ] produces rigid urethane foam for use in car and boat seats, side panels, chairs and other products. The molded foam process uses the same primary and secondary ingredients as Plant No. 1, and the ingredients similarly are pumped to a mixing head. Unlike Plant No. 1, the foam was poured into a series of molds on a carousel beneath the mixing head [*id.* at 8].

6. The molded foam process produces three separate process streams:

a. *Pre–Flush.* [There is no dispute that this process stream is not a hazardous waste and, thus, not a subject of the current indictment.]

b. *Leakage.* [There is also no dispute that this process stream is not a hazardous waste and, thus, not a subject of the current indictment.]

c. *Flush.* [This] ... process stream, which allegedly constituted an FOO2 listed hazardous waste, is generated after each pour and involves short bursts of methylene chloride used to purge the mixing head of remaining foam ingredients. This purged material also drains into the barrel or box beneath the foaming unit, where it [is] combined with the other streams from the pre-flush and leakage processes [*id.* at 9].

7. **For purposes of this motion only,** RFC concedes that the Flush stream at both Plants as set forth above is a stream containing a spent solvent and that, therefore, the materials at issue in this case are

a mixture of two non-hazardous waste streams (pre-flush and drainage) and a hazardous waste stream (flush) [*see* Doc. 174, p. 1].

8. In light of no. 7, the issue before the court is a purely legal one ripe for decision.

The question squarely before the court at present is whether the mixture of two non-hazardous waste streams and one hazardous waste stream constitute an FOO2 listed hazardous waste under the appropriate Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.,* regulations.

## II. *RCRA AND HAZARDOUS WASTE CLASSIFICATIONS*

■ The objectives of RCRA are to promote the protection of health and the environment and to conserve valuable material and energy resources by—[inter alia,]

.      .      .      .      .

(4) regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment, ....

42 U.S.C. § 6902(4). In an effort to obtain these objectives, the Environmental Protection Agency ("EPA") is directed to

develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste which should be subject to the provisions of [RCRA], ....

42 U.S.C. § 6921. As a result of this directive, the EPA has promulgated regulations which explain what materials constitute hazardous waste. *See* 40 C.F.R. § 260.1, *et seq.* In order to be a hazardous waste, a waste must first be a "solid waste" as defined in 40 C.F.R. § 261.2. Once it is determined that a solid waste is involved, a waste is considered hazardous if it has the characteristics of a hazardous waste; *i.e.,* toxicity, ignitability, corrosivity, or reactivity; or if it exhibits the characteristics of a hazardous waste, has been found to be fatal, or it contains certain toxic constituents. 40 C.F.R. §§ 261.10; 261.11; 261.20–261.24. There are

three categories of "listed wastes", referred to as follows: (1) "P" and "U" wastes, which identify by name certain commercially pure or technical grades of commercial chemical products or formulations in which the listed chemical is the sole active ingredient, *see* Doc. 122A, at 13; 40 C.F.R. § 261.33; (2) "K" wastes, which identify wastes produced from specific sources, such as wastewater treatment sludge from the production of chrome yellow and organe pigments (KOO2), *see* 40 C.F.R. § 261.32; and (3) "F" wastes, which identify wastes from non-specific sources, such as spent solvents, *see* 40 C.F.R. § 261.31. It is alleged in this case that the waste material collected at Recticel Plant numbers 1 and 3 constitutes an *F*002 listed waste.

## III. *FINDINGS AND CONCLUSIONS*

RFC contends, *inter alia,* that, assuming for purposes of this motion that the flush stream described in Part I of this Report and Recommendation contained an F002 listed solvent, this stream was mixed with other non-hazardous process streams; that such mixtures are not covered by the listings; that the only possible basis under which the collected materials could even be classified as hazardous waste is under the now invalidated Mixture Rule; that this mixture constitutes a **post-use** mixture of an F002 listed solvent with non-hazardous wastes; that for over 12 years the Environmental Protection Agency ("EPA") expressly and consistently stated that the FOO2 listing does not apply to **post-use** mixtures of FOO2 listed solvents and non-hazardous wastes; that, rather, the EPA confirmed that any **post-use** blends involving listed solvents would be regulated by the Mixture Rule; that the Mixture Rule was invalidated by the United States Court of Appeals for the D.C. Circuit in *Shell Oil v. EPA,* 950 F.2d 741 (D.C.Cir.1991); that the defendants had *no* notice or warning that the mixture of the waste streams at issue would constitute an "F" listing; that RFC, therefore, cannot be prosecuted under the listings; and that the Indictment must be dismissed [Doc. 122A].

The government responded to the defendant's motion, contending that the proper characterization of the materials at issue is not dependent upon either *Shell Oil, supra,* or the Mixture Rule; that there are four bases for characterizing the material at issue as hazardous, notwithstanding the decision in *Shell Oil;* that (1) the definition of "spent solvent" under the federal and state regulations necessarily contemplates the mixture of the solvent with a contaminant; that the listing itself, and not the mixture rule, makes the waste a hazardous waste; that (2) RCRA regulates hazardous waste contained in a matrix of non-hazardous material; that (3) at the time of the crimes alleged in this indictment, the applicable law was the independently adopted "mixture rule" of the State of Tennessee; that the federal government is authorized to apply the mixture rule properly promulgated by the State of Tennessee as part of that state's authorized RCRA enforcement program; that, therefore, the question regarding the status of the federal "mixture rule" is irrelevant to this case; and that (4) the decision of the Eighth Circuit in *United States v. Goodner Brothers Aircraft, Inc.,* 966 F.2d 380 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993), that the invalidation of the mixture rule is retroactive is erroneous.

Each of the government's four bases for classifying the material at issue as a hazardous waste will be discussed seriatim below.

### A. *The Material is an F002 Listed Material*

■ The government contends that spent solvents, by their very definition, are mixtures of a solvent and a contaminant; that F002 spent solvent waste is a hazardous waste totally independent of the mixture rule; that *Shell Oil* does not affect F002 spent solvent waste listings and is, thus, not relevant to the wastes generated by the defendants in this case; and that in the case of *In re Cypress Aviation, Inc.* (Env.App.Bd., RCRA (3008) No. 92–1, Nov. 17, 1992), the Environmental Appeals Board ("EAB") held that F002 spent solvent waste listings are not affected by the mixture rule [Doc. 161].

The defendant responded that the government's argument ignores twelve years of unequivocal statements by the EPA establish-

ing that the F002 listing relied on by the prosecution does not cover mixtures of spent solvents and other non-hazardous wastes; that prior to 1985 the F002 listing encompassed only pure solvents; that in 1985 the F002 listing was revised to include **pre-use** mixtures of solvents; *i.e.*, commercial products containing solvent blends and other materials; that the EPA noted that the revised listing does not apply when spent solvents are mixed **after** use; but rather, that such mixtures are regulated under the mixture rule; that the government ignores the unbroken history of EPA statements excluding post-use mixtures from the scope of F002; that in light of EPA's long standing interpretation of its own regulations, the F002 listing is not applicable to the post-use mixture of flush with the pre-flush and drainage process streams; that the *Cypress Aviation, supra,* case is not applicable to this case since that case involved only one waste stream; and that the materials at issue here are not F002 listed hazardous waste [Doc. 174].

40 C.F.R. § 261.31 **currently** provides, and since 1985 has provided, in pertinent part, as follows:

(a) The following solid wastes are listed hazardous wastes from non-specific sources unless they are excluded under §§ 260.20 and 260.22 and listed in appendix IX.

. . . . .

F002 The following spent halogenated solvents: ... Tetrachloroethylene, **methylene chloride,** trichloroethylene, 1,1,1–trichloroethane, chlorobenzene, 1,1,2–trichloroethane; all spent solvent mixtures/blends containing, **before use,** a total of ten percent or more (by volume) of one or more of the above halogenated solvents or those listed in F001, F004, or F005; and still bottoms from the recovery of these spent solvents and spent solvent mixtures [ (emphases added) ].

There is no dispute that prior to the 1985 revision of the F002 listing, the listing encompassed only solvents in their pure formulation or technical grade. Testimony was taken from Ms. Marcia Williams, an expert in the field of hazardous and solid wastes. Ms. Williams is currently the president of her own company, Environmental Management Consulting Company, and, among other things, consults with both private and public sector clients in applying and complying with the RCRA regulations. Between 1970 and 1988, however, Ms. Williams was employed by the EPA, and from September, 1985 until February, 1988 she was Director of the Solid Waste division of the EPA. During her tenure at the EPA, and particularly during her tenure in the Solid Waste division, Ms. Williams "[d]irected [a] 250 person, $40 million annual program to implement the 1984 Hazardous and Solid Waste Amendments, which required issuing over 70 new, controversial rules in three years" [Defendant's Exhibit 6]. Thus, Ms. Williams dealt extensively with RCRA, the regulations, and their application to the regulated community. In fact, Ms. Williams personally approved the 1985 amendment to the F002 listing for spent solvents. Ms. Williams has provided Congressional testimony on many RCRA related issues during and after her tenure at EPA on topics including subtitle C and subtitle D [*see* Defendant's Exhibit 8]. Ms. Williams testified that the 1984 amendments for which she had the responsibility of implementing were designed, *inter alia,* to close loopholes and expand the program; that there was a big loophole in the F002 listing prior to 1985 when a solvent had to be "pure" to be a listed hazardous waste; that the loophole resulted from the fact that many solvents were blends and not pure; that the EPA wanted to include the solvent blends and that this was the reason for the amendment in April, 1985; that as Director of the Office of Solid Waste, the new F002 listing regulation was one of the first regulations before her; that the EPA's concern was with the **pre-use** commercial blends of solvents, which concern is reflected in the "before use" language of the listing; that she is not aware of any regulation or EPA statement that made, or indicated that, a **post-use** mixture of spent solvents was a F002 listing; *that, rather, the EPA said that post-use mixed spent solvent wastes were already regulated in RCRA under the Mixture Rule;* that a post-use mixture is a mixture of a solvent stream and another waste stream; and that in her opin-

ion the waste mixture at issue in this case is a post-use mixture. Ms. Williams' testimony is supported by EPA statements set forth in the Federal Register. Prior to the 1985 amendment to the F002 listing, the EPA published the following in the Federal Register:

> **SUMMARY:** The U.S. Environmental Protection Agency (EPA) today is proposing to amend the list of hazardous wastes adopted pursuant to the Resource Conservation and Recovery Act (RCRA) by redefining the universe of solvents considered hazardous wastes. EPA is taking this action to close a major regulatory loophole created by the manner in which spent solvents were originally listed as hazardous wastes. The effect of today's proposal will be to bring certain spent solvent mixtures under RCRA Subtitle C control.

.        .        .        .        .

## II. Reason and Basis for Today's Proposed Rule

### A. EPA's Concern With Solvent Mixtures

EPA is concerned that the present interpretation of the solvent listings allows many toxic spent solvent wastes to remain unregulated. The Agency has determined that a diverse group of industries ... use solvent mixtures. For example, the majority of solvents, used in degreasing operations are blends.

.        .        .        .        .

## IV. Effect of Today's Proposal

... **If a generator does not either mix the solvents before use or purchase mixed solvents for use, but mixes spent solvent wastes after use, the mixed spent solvent wastes are already regulated under RCRA, pursuant to the "mixture rule" contained in 40 CFR 261.3 [ (emphasis added) ].**

50 Fed.Reg. 18378; 18380 (April 30, 1985); Defendant's Exhibits 12 and 13. Ms. Williams testified that Preambles, such as that quoted above, set forth the EPA's thinking on a proposed rule; that this information allowed meaningful comments to be made on a proposed rule; and that the regulated community would look to the Preamble, as well as Guidance Documents which are prepared after a regulation is finalized, to find out the EPA's thinking on an issue.

The regulated public had the right to rely on this clear pronouncement of EPA policy. It is true that the quote does not say that mixed spent solvent wastes are *exclusively* regulated under the Mixture Rule, but the regulated public should not have to make such fine technical distinctions in trying to conform their actions and conduct to laws and regulations that carry serious criminal penalties. EPA never said anywhere else during the critical time period that mixed spent solvents were regulated under anything other than the Mixture Rule.

In December, 1985, the following appeared in the Federal Register:

> **SUMMARY:** The U.S. Environmental Protection Agency (EPA) today is amending the list of hazardous wastes under the Resource Conservation and Recovery Act (RCRA) by redefining the universe of solvents considered listed hazardous wastes. EPA is taking this action to close a major loophole created by the manner in which spent solvents were originally listed as hazardous wastes. The effect of today's rule will be to bring certain spent solvent mixtures under RCRA Subtitle C control.

.        .        .        .        .

In establishing a regulatory threshold for solvent mixtures, the Agency attempted to determine the concentrations at which solvents are known to cause damage to human health or the environment. Since the Agency has not yet developed health-based thresholds for many of these solvents; however, we sought to establish regulatory thresholds for mixtures based on considerations other than minimum concentrations of solvents that can cause adverse health effects. Thus, the Agency proposed to expand the category of spent solvents considered hazardous wastes to include spent solvent mixtures containing ten percent or more (by volume) of total listed solvents. **As a point of clarification, the ten percent threshold applies to solvent mixtures, before use** (footnote omitted).

50 Fed.Reg. 53315; 53316 (December 31, 1985). Even the government's own expert, Mr. David Bussard, Director of the Character and Assessment Division of the EPA, testified that he was not aware that the EPA had ever set forth in the Federal Register that amended F002 would apply to post-use mixtures and that the F002 listing does not speak to the issue of post-use mixtures.

As the undersigned understands the clear language of the F002 listing, enlightened by the testimony of Ms. Williams and EPA statements in the Federal Register, the F002 listing, as amended in 1985, was intended to, and does, reach (1) a spent halogenated solvent mixture or blend in which a spent halogenated solvent, such as methylene chloride (10% or more by volume), is mixed by the generator (RFC in this case) with some other substance, either another spent halogenated solvent or other contaminant, **prior to its use in the manufacturing process** (more simply referred to as the "before use" mixture), and (2) a spent halogenated solvent mixture or blend in which a spent halogenated solvent, such as methylene chloride (10% or more by volume), is mixed with some other substance, either another spent halogenated solvent or other contaminant, by an independent source and sold to the generator (RFC in this case) as a spent halogenated solvent blend (more simply referred to as a purchased mixed solvent). The spent solvent mixture at issue in this case is neither a solvent mixture that was mixed "before use", nor was it purchased as a mixed solvent. Rather, the spent solvent mixture at issue here is a mixture of a spent solvent waste that was mixed with other non-hazardous wastes "after use", *i.e.*, after it was used in the manufacturing process. *See* 50 Fed.Reg. 18380. According to the clear statement of the EPA, such a mixture, at the time of the proposed amendment to the F002 listing (April, 1985), was already regulated by the Mixture Rule. *Id.* Thus, it reasonably follows, and is, in my opinion, clearly indicated in EPA statements, that the EPA saw no reason to include in its proposed amendment to the F002 listing, a post-use mixture of spent solvent waste.

The Mixture Rule referred to above was promulgated in 1980 to "close 'a major loop-hole in the Subtitle C management system[,]' " *Shell Oil Co. v. E.P.A.,* 950 F.2d 741, 749 (D.C.Cir.1991) (quoting 45 Fed.Reg. 33,-095), so that generators of hazardous waste could not evade the hazardous waste requirements simply by mixing hazardous wastes with nonhazardous solid waste to create a "nonhazardous" waste. *Shell Oil, id.* Thus, the Mixture Rule required

that a waste be treated as hazardous if

[i]t is a mixture of solid waste and one or more hazardous wastes listed in Subpart D and has not been excluded from this paragraph under §§ 260.20 and 260.22 of this Chapter.

45 Fed.Reg. 33,119 (40 C.F.R. § 261.-3(a)(2)(ii)).

*Shell Oil,* 950 F.2d at 749. Ms. Williams testified that the Mixture Rule was designed to cover a listed waste combined with other solid waste; that the rule was intended to close a significant loophole which resulted in the EPA having no jurisdiction over a mixture of hazardous and nonhazardous solid waste. The D.C. Circuit, in *Shell Oil, supra,* vacated and set aside the Mixture Rule because the EPA failed to provide adequate notice and opportunity for comment prior to the rule's promulgation. *Shell Oil,* 950 F.2d at 752. *See also United States v. Goodner Brothers Aircraft, Inc.,* 966 F.2d 380 (8th Cir.1992). In *Goodner Brothers, id.,* the Court held that the invalidation of the Mixture Rule applies retroactively. *Goodner Brothers,* 966 F.2d at 385.

In light of the fact that the EPA believed it had the benefit of the Mixture Rule at the time of the 1985 amendment to the F002 listing, and in light of the EPA's own statement as set forth in the Federal Register, I find persuasive and credible the testimony of Ms. Williams that the amended F002 listing was **not** intended to cover post-use mixtures because such mixtures would be encompassed by the Mixture Rule. I further find, under the assumptions appropriate to this motion, that the material at issue in this case constitutes a post-use mixture of a spent solvent hazardous waste with other nonhazardous waste streams. It is precisely such mixtures that the Mixture Rule was intended

to bring within the hazardous waste provisions of RCRA, as demonstrated by the EPA's statements in the Federal Register when the Mixture Rule was promulgated:

### 1. What is a Hazardous Waste?

Paragraph (a) of this section defines what a hazardous waste is. It provides that a solid waste is a hazardous waste if it is not excluded under § 261.4(b) and it either (1) is listed as a hazardous waste in Subpart D, (2) is a waste mixture containing one or more hazardous wastes listed in Subpart D or (3) exhibits one or more characteristics of hazardous waste identified in Subpart C.

. . . . .

**Except for waste mixtures, all these provisions were contained in EPA's December 18, 1978 proposal.... The waste mixtures provision is a clarification which has been added in response to inquiries about whether mixtures of hazardous and nonhazardous wastes would be subject to Subtitle C requirements. This is a very real issue in real-world waste management, since many hazardous wastes are mixed with non-hazardous wastes or other hazardous wastes during storage, treatment, or disposal.**

**Although it was not expressly stated in the proposed regulation, EPA intended waste mixtures containing listed hazardous wastes to be considered a hazardous waste and managed accordingly. Without such a rule, generators could evade Subtitle C requirements simply by commingling listed wastes with nonhazardous solid waste. Most of these waste mixtures** would not **be caught by Subpart C characteristics because they would contain wastes which were listed for reasons other than that they exhibit the characteristics (***e.g.***, they contain carcinogens, mutagens or toxic organic materials). Obviously, this would leave a major loophole in the Subtitle C management system and create inconsistencies in how wastes must be managed under that system.**

45 Fed.Reg. 33095 (May 19, 1980) (emphases added); Defendant's Exhibit 15.

The government relies upon the case of *In re Cypress Aviation, Inc.* (Env.App.Bd., RCRA (3008) No. 92–1, Nov. 17, 1992), for the proposition that the waste stream at issue here constitutes an F002 listed hazardous waste. For the reasons indicated below, I find that the *Cypress Aviation, supra,* case is inapposite to the case sub judice. In *Cypress, supra,* the City of Lakeland, Florida ("Lakeland") and Cypress Aviation, Inc. ("Cypress") had been found liable for failing to analyze and properly dispose of F002 wastes. Lakeland and Cypress sought reconsideration of that decision by the Environmental Appeals Board ("EAB") based upon the invalidation of the mixture and derived-from rules. The F002 waste at issue in *Cypress* was generated at an aircraft painting and paint stripping facility and consisted of wastewater, dissolved paint, paint chips, and spent solvent. The court noted that it was undisputed that the spent solvent originally contained more than 10% and as much as 62–67% methylene chloride and reasoned as follows:

[T]he presence of the spent solvent makes the "waste mixture" an F002 hazardous waste under § 261.31 (citation omitted). This section specifies that F002 wastes include "all spent solvent mixtures/blends containing, before use, a total of ten percent or more (by volume) of [methylene chloride]...." In essence, the definition of F002 wastes by its own terms renders some "spent solvent mixtures" hazardous wastes. The *Shell Oil* mandate did not affect this provision (footnote omitted).

*Cypress Aviation,* slip op. at 5. The EAB does not specifically state that there was only **one** waste stream involved in *Cypress;* however, there is nothing in the court's language to indicate that there was more than one waste stream. In fact, the court refers to only "a 'waste mixture'" as opposed to "waste mixtures". The hazardous waste mixture in *Cypress* was not mixed with any other waste mixtures, either hazardous or nonhazardous. The case sub judice involves **three** waste mixtures, flush, pre-flush, and drainage. These three waste mixtures are ultimately mixed together into one drum or other container. As the Court held in *Cypress,* the Mixture Rule was **never implicated in**

**that case.** This is a major distinction between this case and the *Cypress* case. The situation in *Cypress* would be on all fours with this case **IF** the **only** waste stream at issue in this case were the Flush waste stream, which for purposes of this motion is conceded to be an F002 listed waste. In this case, however, unlike the *Cypress* case, the F002 listed waste stream (Flush) was mixed with two other nonhazardous waste streams (Pre–Flush and Drainage), creating the mixture of a listed waste with another solid nonhazardous waste and, thus, creating the precise mixture that the Mixture Rule was intended to capture and bring within the jurisdiction of the EPA pursuant to RCRA. Accordingly, the case currently before this court is acutely distinguishable from the *Cypress Aviation, supra,* case, and I find that *Cypress Aviation,* does not dictate the appropriate outcome of the case pending before this court.

In light of all the foregoing, and on the facts assumed for purposes of this motion, I find that the material at issue in this case constitutes a post-use mixture of a listed spent solvent with other nonhazardous solid waste streams; that the F002 listing does not encompass post-use mixtures of spent solvents and other nonhazardous solid wastes; that, rather, such a mixture was intended to be covered by the now invalid Mixture Rule; and that the post-use waste mixture at issue in this case is not an F002 listed waste.

### B. *RCRA Regulates Hazardous Waste Contained in a Matrix of Non–Hazardous Material*

The government contends that listed hazardous waste remains hazardous until delisting; that this principle is sometimes referred to as the "continuing jurisdiction principle"; that one aspect of this principle is that materials containing listed hazardous waste are subject to RCRA regulation, without regard to the Mixture Rule; that the most frequent application of this policy has occurred in the context of the regulation of mixtures of listed hazardous wastes and non-waste materials, such as soil, or groundwater; that the Mixture Rule would not literally apply to such a mixture because soil and groundwater are not solid wastes and the

Mixture Rule has been limited to mixtures of listed waste and nonhazardous solid wastes; that the EPA interprets the hazardous waste listing rules to regulate mixtures of listed wastes and other materials because the materials "contain" the listed waste and thus must be managed as hazardous waste so long as the mixture continues to "contain" the listed waste; that the regulation of these mixtures derives, not from the specific rules such as the Mixture Rule, but rather, from the more general principles and provisions embodied in the rules; that the Agency determined that mixtures of listed hazardous wastes and certain wastes excluded from hazardous waste regulation would be subject to regulation as hazardous waste regardless of the applicability of the mixture or derived-from rules; that these wastes " 'would continue to be subject to regulation because the "mixture" would "contain" listed hazardous waste, subject to regulation unless delisted.' 54 Fed.Reg. 36623 (September 1, 1989)"; that in *Chemical Waste Management v. EPA,* 869 F.2d 1526 (D.C.Cir.1989) (*"Chem Waste"*), the D.C. Circuit upheld the EPA's interpretation that contaminated media were regulated as hazardous waste in part based on the general framework rules; that the Court found that the general principles established in the regulations provided a basis for regulation of mixtures and residues, apart from the specific mixture and derived-from rules; that these rules are only an application of the more general principle embodied in the regulation that a " 'hazardous waste remains a hazardous waste' "; that the court in *United States v. Bethlehem Steel Corporation,* 829 F.Supp. 1023 (N.D.Ind.1993) agreed with the interpretation which the government now urges; that according to *Bethlehem Steel, supra,* a listed hazardous waste (such as the F002 waste in this case) remains hazardous until delisted even if it is combined with other non-hazardous solid waste; that this interpretation has also been adopted by the EPA in its administrative decisions after *Shell Oil, supra;* that the government's interpretation of the general framework principles does not attempt to negate the *Shell Oil* decision or suggest that the Mixture Rule was an unnecessary regulation; that the con-

tinuing jurisdiction principle means only that the hazardous waste portion of the mixture is subject to regulation; that the material at issue here contained F002 spent solvent; and that, therefore, the general framework principles provide an independent basis for characterizing the waste stream at issue as a hazardous waste.

The defendant responded, contending that the government's analysis ignores the central role of the Mixture Rule in the RCRA scheme as defined by over twelve years of EPA interpretive documents and statements; that "continuing jurisdiction" necessarily implies original jurisdiction and, absent the Mixture Rule, there is no RCRA hazardous waste jurisdiction over the materials at issue; and that additionally the EPA and the federal courts recognize that the "contained in" policy applies only to environmental media such as soil or groundwater which has been contaminated by hazardous wastes. Specifically, defendant contends that the government has stated that there are two ways to identify a hazardous waste under RCRA; that hazardous wastes are defined by a particular characteristic or by listing; that in this case, the defendants are charged with violations involving listed hazardous wastes; that the government ignores the unbroken history of statements by the EPA, the Justice Department and the Courts which explain the role of the Mixture Rule in the RCRA scheme; that these statements demonstrate that, absent the Mixture Rule, the mixture of a listed waste with non-hazardous wastes would fall entirely outside the RCRA hazardous waste scheme; that when the EPA stated that the purpose of the Mixture Rule was to close a major loophole which would allow generators to evade the hazardous waste requirements simply by mixing listed wastes with non-hazardous wastes, the EPA did not say that absent the Mixture Rule it would be authorized to assert "continuing jurisdiction" over the hazardous waste "contained in" the mixture; that, rather, EPA admitted that the mixture, including the listed waste portion of the mixture would be outside the RCRA system; that as explained in the *Chem Waste* case, the "contained-in" policy is intended to supplement the Mixture Rule in order to address a situa-

tion that the Mixture Rule did not cover, *i.e.*, the mixture of hazardous waste with an environmental media; that environmental media, such as soil and groundwater, do not meet the definition of a solid waste and are, therefore, outside the scope of the Mixture Rule; that the "contained in" policy is designed to bridge this gap by regulating the contaminated environmental media; that it was and is not intended to address situations covered by the Mixture Rule; that EPA's description of its own interpretive policy demonstrates that the "contained in" policy is narrow in scope and does not apply to mixtures of a listed waste and nonhazardous solid wastes; that because the "contained in" policy is based on the Mixture Rule, the invalidation of the Mixture Rule in *Shell Oil* demonstrates that the "contained in" policy itself is no longer valid; that at a minimum, the prosecution cannot stretch the "contained in" interpretation backwards to cover the waste streams previously covered by the Mixture Rule as it is attempting to do in this case; that EPA's defense and repromulgation of the Mixture Rule are inconsistent with any assertion that the "contained in" interpretation covers post-use mixtures; that EPA represented to the D.C. Circuit before and after the *Shell Oil* decision that the invalidation of the Mixture Rule would create an enormous hole in the RCRA rules, permitting hazardous wastes to escape the system and jeopardizing pending enforcement cases; that EPA could not have made these representations if an independent "contained in" rule applied; and that for these reasons, the court should reject the government's assertion that the post-use mixtures at issue in this case fall within the definition of hazardous waste under the newly formed "contained in" theory.

### 1. *Continuing Jurisdiction*

■ Ms. Marcia Williams testified that the EPA has no continuing jurisdiction of a waste substance which **contains** a hazardous waste without the Mixture Rule, because without the Mixture Rule the EPA has no original jurisdiction; and that the continuing jurisdiction principle was used by the EPA only in context with the derived-from and Mixture Rules. Ms. Williams also testified that Defendant's Exhibit 10 is a recent chart

prepared by the EPA in April, 1992, for the purpose of giving a good pictorial representation of what current EPA hazardous waste requirements are. This was not disputed by the government's expert, Mr. David Bussard, who testified that he was present at, and in charge of, the public meeting during which this chart was presented.

Assuming, for purposes of this motion that there is a "continuing jurisdiction" theory which survives the invalidation of the mixture rule, a careful examination of the "Hazardous Waste" portion of the EPA's most recent chart on current hazardous waste requirements demonstrates that the EPA never obtained any original jurisdiction to "continue" in this case. The sequential evaluation process for determining whether a solid waste is a hazardous waste as set forth in the chart and the regulations at 40 C.F.R. § 261.3 will be set forth below and demonstrates that the policy of "continuing jurisdiction" can never attach to the facts of this case because the material at issue is not a hazardous waste. This process would have been the same during the times relevant to this prosecution except that the Mixture Rule was void and, thus, inapplicable.

(1) Is the solid waste excluded from regulation as a hazardous waste under § 261.-4(b)? 40 C.F.R. § 261.3(a)(1). If "yes", then waste is not a hazardous waste and evaluation of the material stops. If not,

(2) Does the solid waste meet any of the following criteria? 40 C.F.R. § 261.3(a)(2):

(i) Does the solid waste exhibit a characteristic of a hazardous waste? **[It is agreed that this criteria is not applicable to this case]**. 40 C.F.R. § 261.-3(a)(2)(i). If not,

(ii) Is the solid waste listed in Subpart D & not excluded under §§ 260.20 or 260.22? 40 C.F.R. § 261.3(a)(2)(ii). **[For the reasons stated in Part III.A. of this Report and Recommendation, the answer to this question is "No"]**. If not,

(iii) Is the solid waste a mixture of a solid waste and a hazardous waste that is listed in subpart D solely because it exhibits one or more of the characteristics of hazardous waste identified in subpart C....? 40 C.F.R. § 261.3(a)(2)(iii). **[This is part of**

**the Mixture Rule which was void at all times pertinent hereto and, thus, not applicable to this case]**. If not,

(iv) Is the solid waste a mixture of solid waste and one or more hazardous wastes listed in subpart D....? 40 C.F.R. § 261.-3(a)(2)(iv). **[This is part of the Mixture Rule which was void at all times pertinent hereto and, thus, not applicable to this case]**.

(v) If none of the foregoing criteria [2(i) through (iv) ] are answered in the affirmative, then the solid waste is not a hazardous waste and the evaluation of the material stops.

(vi) If, however, one of the foregoing criteria [2(i) through (iv) ] is answered in the affirmative, then, evaluation proceeds to 40 C.F.R. § 261.3(c) which provides that "[u]nless and until it meets the criteria of paragraph (d) of this section: (1) A hazardous waste will remain a hazardous waste." § 261.3(c)(1).

Defendant's Exhibit 10; 40 C.F.R. § 261.3(a) and (c).

The government relies upon the case of *United States v. Bethlehem Steel Corporation*, 829 F.Supp. 1023 (N.D.Ind.1993) [Doc. 161, Exhibit D attached thereto] for the proposition that "[t]he EPA has long had the policy that once wastes are **listed as hazardous**, they are presumed to remain hazardous." *Id.* at 1032. The undersigned agrees. This position is supported by 40 C.F.R. § 261.3(c)(1) as quoted above. As demonstrated by the sequential evaluation process set forth above, however, in order for 40 C.F.R. § 261.3(c)(1) to become applicable, the waste **MUST FIRST BE A HAZARDOUS WASTE AS DEFINED IN 40 C.F.R. § 261.-3(a)**; *i.e.,* absent the mixture rule, it must be a listed waste or it must exhibit the characteristics of a hazardous waste. Thus, the problem in this case with relying on *Bethlehem Steel, supra,* and/or 40 C.F.R. § 261.3(c) for the proposition that "[t]he EPA has long had the policy that once wastes are listed as hazardous, they are presumed to remain hazardous" [Doc. 161, Exhibit D], is that **the waste at issue here is NOT a listed waste** and, thus, never makes it through the regulations to § 261.3(c). Furthermore, at issue in

*Bethlehem Steel* was an F006 waste, *i.e.*, a wastewater treatment sludge from electroplating, which is clearly a listed wasted under the regulations. *See* 40 C.F.R. § 261.31(a), listing F006. Also, the court in *Bethlehem Steel* noted that the interpretation of the regulation that made the sludge at issue an F006 listed sludge had **"been consistent over time, . . . ."** *Bethlehem Steel*, at 1031. Quite the contrary is true in this case. The interpretation by the EPA of the F002 listing at issue in this case which has been consistent over time is that the mixture of the hazardous and nonhazardous waste streams involved **WOULD NOT BE AN F002 LISTED WASTE, BUT RATHER, WOULD BE REGULATED UNDER THE MIXTURE RULE.** If the EPA intended to interpret its regulations otherwise, it owed a duty to the regulated public to say so in order that the regulated public could conform its conduct and activities accordingly. It is simply too late to give the regulations a new interpretation in order to "save" a prosecution. This is a matter of basic fairness because it is basically unfair to take a "mixture rule case"[1] and try to stretch it to meet a "listing case" based on a new and different interpretation of regulations which were in effect at the relevant time. *Bethlehem Steel, supra,* does **not** support the government's theory of "continuing jurisdiction" in this case.

Finally, if the government's theory of "continuing jurisdiction" would in fact give the EPA jurisdiction over any waste mixture containing nonhazardous waste as long as one of the wastes in the mixture was a hazardous waste, there would have been no "major loophole" to be closed by the Mixture Rule. This would also be true if the court were to accept the testimony of Mr. Bussard that a waste becomes a hazardous waste at its point of generation or at any subsequent point that it becomes a hazardous waste. In its brief to the D.C. Circuit in *Shell Oil, supra,* **the government** made the following argument in an attempt to persuade the D.C. Circuit to save the Mixture Rule:

Although EPA recognized that the mixture rule may result in a limited number of waste streams containing only a small amount of a listed waste being subject to subtitle C even though the commingled waste is not hazardous, the Agency concluded that the impact of the rule was limited by virtue of the delisting process. In any event, such instances could be limited as "the burden of having to manage a waste mixture as a hazardous waste could be easily avoided by carefully segregating hazardous and non-hazardous waste." 45 Fed.Reg. at 33,095 (J.A. at 45). A contrary rule allowing generators to evade subtitle C requirements simply by commingling waste streams, however, "would leave a major loophole in the Subtitle C management system." *Id.* As EPA recognized,

> [m]ost of these waste mixtures would [otherwise] not be caught by the Subpart C characteristics because they would contain wastes which were listed for reasons other than that they exhibit the characteristics (*e.g.*, they contain carcinogens, mutagens or toxic organic materials.)

*Id.* Indeed, evasion of subtitle C would be as easy as mixing any small amount of nonhazardous waste with a listed waste. *Id.* **Even though that mixture is still hazardous, it will not exhibit any of the four characteristics and would go unregulated in the absence of these rules.** *Id.; cf.* D–2372 at 47–48 (J.A. at 550–51). . . .

Defendant's Exhibit 20, Tab 10 (emphasis added). It is my opinion that the foregoing language taken straight from the government's brief, in addition to the EPA's own statements regarding the need for, and purpose of, the Mixture Rule as set forth in Part III.A. of this Report and Recommendation, demonstrate that a waste which falls within the regulatory definition of hazardous waste at its point of generation **does not necessarily** remain a hazardous waste (at least not absent the Mixture Rule); and that the "continuing jurisdiction" theory has no application to a waste mixture like the one involved in this case because such a mixture evades

---

1. This is a "mixture rule case" based on the facts assumed for purposes of this motion only. Of course, the undersigned expresses no opinion regarding defendants' guilt or innocence had this case been prosecuted as a state mixture rule case.

subtitle C and is never brought under the jurisdiction of the EPA in the first instance.

Accordingly, I find that this case is being prosecuted as a listing case[2]; that for the reasons stated in Part III.A. of this Report and Recommendation the material at issue does not meet the F002 listing; that the material at issue does not satisfy any of the other criteria for determining that a solid waste is a hazardous waste; that, therefore, the materials involved in this case did not constitute hazardous waste under the applicable regulations; that, as a result, the EPA never had jurisdiction of the waste mixture involved in this case; and that, therefore, there is no "continuing jurisdiction" to apply to the material at issue in this case.

### 2. Contained–In Policy

██ Ms. Marcia Williams testified that the "contained-in policy" is the policy applied by the EPA when a hazardous waste is found in another material that is not a solid waste, such as groundwater or soil; that such a mixture is not covered by the Mixture Rule because it involves the mixture of a hazardous waste with other than a solid waste; that the "contained-in policy" provides that a hazardous waste mixed with other than a solid waste must still be managed as if it were a hazardous waste; that she is not aware of any case where the EPA applied the "contained-in policy" to a mixture of hazardous waste and solid waste; that she authored several interpretive memoranda regarding the proper application of the "contained-in policy"; and that she is not familiar with any document or interpretive memoranda that has applied the "contained-in policy" to a mixture of hazardous waste and solid waste. Ms. Williams' testimony is supported by interpretive memoranda she authored while Director of the Office of Solid Waste, which memoranda have been cited by the government. In a Memorandum to Mr. Patrick Tobin, Director of the Waste Management Division, Region IV, dated November 13, 1986, Ms. Williams states the following:

This is in response to your memorandum of September 18, 1986, regarding the regulatory status of ground water contaminated with hazardous waste leachate. To answer this question, one first has to determine the status of ground water. Under the regulations, ground water contained in the aquifer is not considered a solid waste, since it is not "discarded" in the sense of being abandoned, recycled, or inherently waste-like as those terms are defined in the regulations (citation omitted). Therefore, contaminated ground water cannot be considered a hazardous waste via the mixture rule (*i.e.*, to have a hazardous waste mixture, a hazardous waste must be mixed with a *solid waste*, see 40 CFR 261.-3(a)(2)(iv)). Nevertheless, ground water contaminated with hazardous waste leachate is still subject to regulation since it *contains* a hazardous waste. Therefore, the treatment, storage, or disposal of ground water contaminated with hazardous waste leachate must be handled *as if* the ground water itself were hazardous since hazardous waste leachate is subject to regulation under Subtitle C of RCRA....

Doc. 161, Exhibit B attached thereto; Defendant's Exhibit 18 (emphases in original). Similarly, in a Memorandum authored by Ms. Williams to Mr. David Stringham, Chief of the Solid Waste Branch, 5HS–13, Region V, Ms. Williams explains that

[t]he regulation of contaminated materials depends in large part upon the regulations being applied and upon the source of the contamination. As written, the mixture rule would not cause the sediments in the harbors on the Great Lakes (nor in any other harbors or rivers) to be considered hazardous. More specifically, the mixture rule states that any mixture of a hazardous waste with a *solid waste* causes the entire mixture to be hazardous. Therefore, in order for the mixture rule to be triggered, wastes must be mixed or somehow combined together. In the example cited in your letter, however, wastes are not being mixed (*i.e.*, we would not normally consider sediments in rivers as wastes). Rather, a waste is being disposed of with a non-

---

**2.** During oral argument, defense counsel stated that this case was investigated as a "mixture rule" case but the thrust of the charges changed after that rule was invalidated. I do not recall the government taking issue with this assertion.

waste material. Therefore, the mixture rule is not causing these sediments to be hazardous. However, application of the mixture rule is not dispositive of the issue of whether the mixture of a hazardous waste and another substance is regulated. A part [sic] from the mixture rule, the mixture of a hazardous waste and a non-waste material is still subject to Subtitle C control. For example, ground water contaminated with a hazardous waste is currently subject to the appropriate requirements in 40 CFR Parts 264 and 265. . . .

Doc. 161, Exhibit C attached thereto; Defendant's Exhibit 19. Finally, in a letter dated March 26, 1991, to Mr. John E. Ely, Enforcement Director of the Virginia Department of Waste Management, from Ms. Sylvia Lowrance, Ms. Williams' successor as Director of the Office of Solid Waste, Ms. Lowrance explains the following:

The "contained-in" interpretation addresses environmental media (i.e., ground water, soil, and sediment) contaminated with RCRA listed hazardous waste. Our federal regulations at 40 CFR Part 261.3 identify hazardous wastes. Among other things, these regulations state that a solid waste mixed with a hazardous waste is a hazardous waste. However, these regulations generally do not specifically address environmental media, which are not solid wastes, mixed with listed hazardous waste. The Agency's position continues to be that mixtures of environmental media and listed hazardous waste (i.e., contaminated ground water, contaminated soil, and contaminated sediments) must be managed as if they were hazardous waste. This position is known as the "contained-in" policy. EPA's application of the "contained-in" policy to contaminated media was upheld by the D.C. Circuit Court of Appeals in *Chemical Waste Management, Inc. v. U.S. EPA,* 869 F.2d 1526 (D.C.Cir.1989).

Defendant's Exhibit 16. In *Chem Waste, supra,* the D.C. Circuit dealt strictly with the issue of an **environmental media** contaminated with a listed hazardous waste and recognized that the EPA's approach to contaminated environmental media is separate and distinct from its approach to situations governed by the mixture and derived-from rules since these rules govern mixtures of hazardous waste and **other solid waste.** *Chem Waste,* 869 F.2d at 1538, n. 14 and 1539. *Chem Waste* does not support the government's position that the "contained-in policy" has any application to the waste mixtures in this case.

I find that the evidence presented is overwhelming that the "contained-in" policy has **only** been applied to mixtures of a hazardous waste and an environmental media (a non solid waste); and that this policy is not applicable to the materials at issue in this case. The government's argument to the contrary is rejected.

C. **State Mixture Rule**

■ The government contends that the Tennessee Mixture Rule independently provides ample legal authority under which to federally prosecute the offenses alleged in the indictment; that under the provisions of RCRA, the United States may federally prosecute the defendants for violating the State of Tennessee's Mixture Rule which is *identical to the vacated federal Mixture Rule;* that the Tennessee Mixture Rule was adopted by Tennessee in conformance with its statutory and regulatory provisions; that RCRA provides a mechanism whereby a state may seek authorization from the Administrator of EPA to administer a hazardous waste program within the state; that once a state receives authorization, then the equivalent State regulations apply "in lieu" of the federal regulations; that the State of Tennessee received authorization from EPA to carry out a hazardous waste program effective February 5, 1985; that the Tennessee laws and regulations are administered by the Tennessee Department of Environment and Conservation which, prior to 1990, was known as the Tennessee Department of Health and Environment; that the Tennessee Mixture Rule was in effect at the time of defendants' conduct (at least that conduct after February 1985); that the Tennessee Mixture Rule operated in lieu of the federal law and to the government's knowledge has never been challenged in any court of law; that RCRA allows the United States to enforce the authorized state rules that have

been federally approved in lieu of the independent federal rules; that the State of Tennessee rules therefore replace federal law and provide the applicable regulatory framework against which to measure the defendants' alleged unlawful conduct; that the federal government retains the authority to bring enforcement actions in a delegated state and apply state laws and regulations; that in *In re: Hardin County, OH*, (Env.App.Bd., RCRA (3008) No. 91–6, Nov. 6, 1992), the EAB held that the state Mixture Rules were the applicable law in authorized states; that consistent with the *Hardin County* case, the independent Tennessee Mixture Rule is the law applicable to the defendants' conduct; and that the Tennessee Mixture Rule is valid and fully supports the charges in this case.

The defendant responded that the government's argument that its prosecution was supported by the state Mixture Rule was rejected by the United States Court of Appeals for the Eighth Circuit in *United States v. Goodner Brothers Aircraft, Inc.*, 966 F.2d 380 (8th Cir.1992); that it is true that under certain circumstances the federal government has the authority to enforce provisions of approved state RCRA programs that implement valid provisions of federal law; that the law is also clear, however, that even in states with approved programs, the federal government has no authority to enforce provisions of the state program that have no valid federal counterpart and are therefore broader in scope than the federal program; that the RCRA regulations specifically recognize this limitation; that in a series of subsequent guidance documents and internal directives, EPA confirmed that federal enforcement powers are limited with respect to any broader coverage under a state program; that, as a result, state requirements that are broader than the federal RCRA program are not enforceable by the federal government; that after *Shell Oil, supra*, there can be no dispute that a Tennessee Mixture Rule when applied to conduct occurring before the *Shell Oil* decision, would expand the universe of regulated hazardous wastes beyond those in the federal program now deemed in effect at the time; that if the Tennessee Mixture Rule is valid the Tennessee program is clearly broader in scope than that portion of the federal program that survived D.C. Circuit review; that the government has no authority to commence a federal criminal prosecution based on a state regulation that is more extensive than the federal counterpart; that the *Hardin County* case has never been reviewed by an independent judiciary; that the government failed to advise the Court of an order entered subsequent to the order submitted by the government; that in this Order, the Administrative Law Judge recognizes that the EPA has no authority to enforce portions of the state RCRA program that are more stringent or broader in scope than the federal law; that recognizing this jurisdictional limit, the ALJ asked the parties to brief its application to the enforceability of the state Mixture Rule; that to the extent that *Hardin County* contradicts the holding of *Goodner Brothers, supra*, it should be rejected on principles of stare decisis; and that for the reasons indicated, the defendants cannot be prosecuted under state regulations that have no federal counterpart.

40 C.F.R. § 271.1 provides, in pertinent part, that

(a) [t]his subpart specifies the procedures EPA will follow in approving, revising, and withdrawing approval of State programs and the requirements State programs must meet to be approved by the Administrator under sections 3006(b) and (f) of RCRA.

.    .    .    .    .

(h)(i) Except as provided in § 271.4, nothing in this subpart precludes a State from:

(1) Adopting or enforcing requirements which are more stringent or more extensive than those required under this subpart;

(2) Operating a program with a greater scope of coverage than that required under this subpart. **Where an approved State program has a greater scope of coverage than required by Federal law, the additional coverage is not part of the Federally approved program.**

There is no dispute that the State of Tennessee received authorization from EPA to carry out a hazardous waste program effective

February 5, 1985. The pertinent Tennessee Mixture Rule in effect at the time of the alleged offenses in this case provides that a waste is a hazardous waste if, *inter alia*, "[i]t is a mixture of waste and one or more hazardous wastes listed in paragraph (4) and has not been excluded from being a hazardous waste under Rule 1200–1–11–.01(3); ...." Tennessee Rule 1200–1–11–.02(c)(IV).[3] The question before me is this: In light of the invalidation of the companion federal Mixture Rule, is the state Mixture Rule more stringent or broader in scope than the federally approved program? As explained in EPA guidance documents and internal directives, if the state rule is simply more stringent than the federal program, then it remains part of the federal program and may be enforced. If, however, the state rule is broader in scope than the federal program, then it is not part of the federally approved program and may not be enforced by the United States in federal court.

> State program requirements that are greater in scope of coverage than the federal program are not a part of the federally-approved program.... Since that portion of the state program does not have a counterpart in the federal program, it does not become a requirement of Subtitle C.... [a] violation of which EPA is entitled to enforce pursuant to 3008(a)(1) and (2). **Therefore, EPA may not enforce that portion of a state program which is broader in scope of coverage than the federal program.**

> .  .  .  .  .

> Provisions in state programs which are more stringent than their federal counterparts are, nevertheless, a part of the approved ... program, and are enforceable by EPA.

"EPA Enforcement of RCRA–Authorized State Hazardous Waste Laws and Regulation," Directive No. 9541.01–82x (March 15, 1982) (emphasis added) (authored by William A. Sullivan, Jr., Enforcement Counsel). Subsequently, in a Memorandum from Lee M. Thomas, Assistant Administrator for Solid Waste and Emergency Response, dealing with the question of how the EPA determines whether a requirement of an authorized State hazardous waste program is broader in scope or more stringent than the Federal RCRA program, Mr. Thomas explained the EPA's position as follows:

*Decision*

To determine whether a particular requirement or provision of a State program is "broader in scope" (and therefore *not* a part of the authorized program) or more stringent (and therefore a part of the authorized program) the questions discussed below should be answered sequentially.

(1) *Does imposition of the State requirement increase the size of the regulated community beyond that of the Federal program?*

A State requirement that *does* increase the size of the regulated community is more "extensive", not more stringent, and is an aspect of the State program which goes beyond the scope of the Federally-approved program. Examples of requirements that are broader in scope include:

.    .    .    .    .

\* listing of wastes which are not in the Federal universe of wastes.

If the requirement *does not* increase the size of the regulated community, the following question should be asked.

(2) *Does the requirement in question have a direct counterpart in the Federal regulatory program?*

If the State requirement *does not* have a direct Federal counterpart, the requirement is also beyond the scope of the Federal regulatory program.

Doc. 174, Exhibit 4, Source Document # 9541.04(84) (May 21, 1984) at pp. 2–3.

It is my opinion that a state Mixture Rule without a federal counterpart Mixture Rule, "increase[s] the size of the regulated community beyond that of the federal program." In other words the state Mixture Rule regulates a community of generators who mix hazard-

---

**3.** Defense counsel, Mr. David Eldridge, Esq., provided a copy of the Tennessee rules to the court.

ous and nonhazardous wastes, while the same community is not regulated by the federal program because there is no companion federal Mixture Rule for the period of time relevant here.[4] Additionally, even if the court were to find that the state Mixture Rule does not increase the size of the regulated community beyond that of the federal program, there can be no dispute that the state Mixture Rule does not, during the times relevant hereto, have a direct counterpart in the Federal regulatory program. Accordingly, I find that the state Mixture Rule is broader in scope than the federal program and, as such, cannot be enforced. *See* "EPA Enforcement of RCRA–Authorized State Hazardous Waste Laws and Regulation," *supra;* Source Document # 9541.04(84).

For the reasons stated, I find the government's argument that the state Mixture Rule governs this case to be without merit.

### D. *Shell Oil Did Not Vacate the Mixture Rule Retroactively*

■ The government contends that if the Court is convinced that the federal Mixture Rule is the applicable law and that its status must be decided to resolve this case, then the government contends that the *Goodner Brothers* decision was wrongly decided; that *Shell Oil* did not act retroactively to vacate the Mixture Rule; that the Eighth Circuit did not afford full meaning to the *Shell Oil* court's concern over "discontinuity in the regulation" of hazardous waste; that the continuing legal force of the mixture and derived-from rules is evident in the court's decision in *Shell Oil* to vacate **and remand** such rules; that a decision only to remand a rule in some cases may leave the challenged rule in effect and enforceable; that even where a remanded rule is no longer in effect such a remand alone does not disturb the legal force and effect of the rule retroactively; that by combining the two concepts of vacating and remanding, and by explicitly stating its concern over discontinuity while recognizing that the rules have remained in effect, the *Shell Oil* court was invalidating

the rules prospectively and inviting EPA to cure the procedural defect; that if the *Shell Oil* court had intended to vacate the rules both prospectively and retroactively, there would have been nothing to remand to EPA; and that for these reasons, this court should hold that the *Goodner Brothers* decision was erroneously decided and that *Shell Oil* did not invalidate the Mixture Rule retroactively.

The defendant responded that the Justice Department has asked both the D.C. Circuit and the Eighth Circuit to adopt this position and both have refused; that the Eighth Circuit explicitly rejected the government's position on the non-retroactive effect of the *Shell Oil* decision and ruled that the unlawful promulgation of the Mixture Rule meant inescapably that it was void from its inception; that a decision changing prior law is fully retroactive to all criminal cases that are pending; and that the prosecution's attempt to relitigate this fundamental proposition one more time should be rejected out of hand.

> In *Shell Oil,* the D.C. Circuit held that [b]ecause the EPA has not provided adequate notice and opportunity for comment, we conclude that the mixture and derived-from rules must be set aside and remanded to the EPA. In light of the dangers that may be posed by a discontinuity in the regulation of hazardous wastes, however, the agency may wish to consider reenacting the rules, in whole or part, on an interim basis under the "good cause" exemption of 5 U.S.C. § 553(b)(3)(B) pending full notice and opportunity for comment. *See e.g., Mid–Tex Elec. Co-op, Inc. v. FERC,* 822 F.2d 1123, 1131–34 (D.C.Cir. 1987).
>
> As we **vacate** them on procedural grounds, we do not reach petitioners' argument that the mixture and derived-from rules unlawfully expand the EPA's jurisdiction under Subtitle C of RCRA.

*Shell Oil,* 950 F.2d at 752 (emphasis added). In the subsequent case of *United States v. Goodner Brothers Aircraft, Inc., supra,* the government made the identical argument which is now before this court—that the in-

---

**4.** A new Mixture Rule was promulgated by the EPA in 1992 on an emergency basis after the federal appellate courts voided the original Mixture Rule. Therefore, a Mixture Rule is now in force and effect. 40 C.F.R. § 261.3(a)(2)(iv) (1992).

validation of the Mixture Rule does not apply retroactively. The Eighth Circuit rejected the government's argument and, because the undersigned is persuaded by the Eighth Circuit's reasoning and is of the opinion that the United States Court of Appeals for the Sixth Circuit would adopt that reasoning, the Eighth Circuit's decision regarding the retroactive application of *Shell Oil* is set forth in full below:

> A regulation not promulgated pursuant to the proper notice and comment procedures has no "force or effect of law" and therefore is void ab initio. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979). "Yet, when equity demands, an unlawfully promulgated regulation can be left in place while the agency provides the proper procedural remedy." *Fertilizer Inst. v. E.P.A.*, 935 F.2d 1303, 1312 (D.C.Cir.1991) (citations omitted). The *Shell Oil* court "vacated" and "set aside" the mixture rule. 950 F.2d at 752. The government argues, however, that under the same authority the court had to leave the rule in place, it chose to invalidate the rule only prospectively. Based upon the language in *Shell Oil* that the EPA may wish to reenact the mixture rule on an interim basis pending full notice and comment to avoid "*discontinuity* in the regulation of hazardous wastes," the government asserts that the court must have intended only prospective invalidation because discontinuity would not exist if the rule was void ab initio. 950 F.2d at 752 (emphasis added). We reject the government's interpretation because it is inconsistent with the language in *Shell Oil* that specifically pronounces that the rule is "vacated" and "set aside." (footnote omitted). The District of Columbia Circuit has previously noted in another case that "[t]o 'vacate,' as the parties should well know, means 'to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside.'" *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C.Cir.1983) (citations omitted). In addition, the language regarding "discontinuity" could easily refer to the practical effect of invalidation of the

mixture with respect to the compliance practices of the regulated industries rather than referring to the legal force of the mixture rule.

> The government argues that under the test in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the invalidation should only apply prospectively. Retroactive application of the decision in *Shell Oil*, however, is "consistent with the Supreme Court's recent decision in *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, [538–41,] 111 S.Ct. 2439, 2445–46, 115 L.Ed.2d 481 (1991), in which the Court announced that full retroactivity is the normal rule in civil cases and limited the applicability of *Chevron Oil['s]* ... test for prospectivity." *Bottineau Farmers Elevator v. Woodward–Clyde Consultants*, 963 F.2d 1064, 1074 (8th Cir.1992). Under *James B. Beam Distilling*, full retroactive effect must be given to a new rule of civil law when the new rule is applied to the litigants in the case in which the rule was announced. *Boudreau v. Deloitte, Haskins & Sells*, 942 F.2d 497, 498 n. 1 (8th Cir.1991). The court in *Shell Oil* did not expressly reserve the question of retroactivity or of whether its holding should apply to the parties before it. On the contrary, it declined to reach the substantive arguments of the petitioner regarding the mixture rule because it had vacated the mixture rule. 950 F.2d at 952. If the court had not applied the invalidation of the mixture rule to the parties before it, it would have been required to reach the substantive arguments. Under *James B. Beam Distilling* and consistent with the meaning of the word "vacate," we find that invalidation of the mixture rule applies retroactively.

*Goodner Brothers*, 966 F.2d at 384–385. The undersigned agrees and adopts the foregoing in full. Accordingly, I find that the *Shell Oil, supra*, decision invalidated the Mixture Rule ab initio; and that, therefore, it is as if the Mixture Rule had never been promulgated. *Goodner Brothers, supra.*

### E. "U" Listed Hazardous Waste

■ The government contends that there is a fourth waste stream at issue; *i.e.*, the

"Filter Waste"; that this waste stream was created when unused chemicals were removed from the production line prior to use during the course of cleaning the filters in the feed lines; that the evidence will show that these pure waste chemicals were routinely disposed of by dumping the chemicals into the 55–gallon drums situated below the production line; and that it is this waste stream that is the basis for all charges relating to the "U" listed wastes.

The defendant contends that because the chemicals which are the subject of the "U" listing charges are mixed with the other three waste streams at issue in this case, this mixture was regulated by the Mixture Rule rather than any Listing regulation; and that the charges involving these chemicals must be dismissed for the same reason that charges involving the other waste streams must be dismissed.

The undersigned agrees. There is no allegation that the "U" Listed wastes, *i.e.*, pure methylene chloride and/or TDI were captured in a separate drum and disposed of separately from the other three waste streams at issue in this case. In fact, the government concedes in its brief [Doc. 161, p. 10], and conceded at the July 15, 1993, hearing that the "U" wastes were mixed in the drums and boxes containing the other waste mixtures. 40 C.F.R. § 261.33 provides, in pertinent part, that

> [t]he following materials or items are hazardous wastes if and when they are discarded or intended to be discarded as described in § 261.2(a)(2)(i), . . . .
>
> .    .    .    .    .
>
> (a) Any commercial chemical product, or manufacturing chemical intermediate having the generic name listed in paragraph (e) or (f) of this section.
>
> .    .    .    .    .

In the official "Comment" to the regulation, it is explained that

> [t]he phrase "commercial chemical product or manufacturing chemical intermediate having the generic name listed in ..." refers to a chemical substance which is manufactured or formulated for commercial or manufacturing use which **consists of the commercially pure grade of the chemical, any technical grades of the chemical that are produced or marketed, and all formulations in which the chemical is the sole active ingredient.** It does not refer to a material, such as a manufacturing process waste, that contains any of the substances listed in paragraph (e) or (f). Where a manufacturing process waste is deemed to be a hazardous waste because it contains a substance listed in paragraph (e) or (f), such waste will be listed in either § 261.31 or § 261.32 or will be identified as a hazardous waste by the characteristics set forth in subpart C of this part [(emphasis added)].

In light of the government's concession in its brief and at the evidentiary hearing on July 15, there is no dispute that the MeCl or TDI was **not** discarded in its **pure** form; rather, it was mixed with two nonhazardous waste streams and · one hazardous waste stream and then discarded. Thus, according to the official "Comment" in the regulations, in order to be a hazardous waste, the ultimate mixture must be, for purposes of this case, an F002 listed waste. For the reasons set forth in Part III.A. of this Report and Recommendation, this case does not involve an F002 listed waste.

Accordingly, it is my opinion that the charges involving alleged "U" listed wastes in this case must be dismissed.

### F. *Illegal Treatment*

█ The government contends in a footnote in its Surresponse that under the facts as assumed for purposes of this motion, *i.e.*, that the flush waste stream is a hazardous waste, Counts 1, 5, 6, 7, and 8 cannot be dismissed; that if the waste is hazardous to begin with and if the waste is nonhazardous after mixture, then the process of mixing the wastes constitutes illegal treatment of the hazardous waste; that, therefore, at the outer limits of the defendants' argument they must concede that their activities constituted illegal treatment of the hazardous waste; and that because Counts 1, 5, 6, 7, and 8 all charge defendants with illegal treatment, the

court cannot dismiss those counts of the indictment.

The defendant responded at the July 15, evidentiary hearing that there is nothing in the Federal Register or the Mixture Rule which suggests that mixing hazardous and nonhazardous wastes constitutes illegal treatment; and that if mixing had been considered illegal treatment by the EPA, there would have been no need for the Mixture Rule.

The undersigned agrees.[5] As the defendant points out, if mixing hazardous and nonhazardous waste had been considered illegal treatment of a hazardous waste by the EPA there would have been no "major loophole" to close with the promulgation of the Mixture Rule. As the EPA itself states in the Federal Register, without the Mixture Rule "generators **could evade Subtitle C requirements simply by commingling listed wastes with nonhazardous solid waste.**" 45 Fed.Reg. 33095 (May 19, 1980). The latter statement would not be true if mixing a hazardous and a nonhazardous waste constituted illegal treatment of a hazardous waste.

For all of the reasons stated herein, I find that the material which is the subject of this indictment did not constitute "hazardous waste" under the properly promulgated EPA regulations applicable during the time encompassed by this indictment. It was the business of the EPA, and not the regulated public, to have foreseen the potential for avoiding regulation by simply mixing hazardous and nonhazardous wastes and to have addressed such a situation in its proposed regulations. *Shell Oil,* 950 F.2d at 751. This the EPA did not do. Rather, this potential for avoidance was recognized and addressed in an eleventh hour regulation which was not promulgated pursuant to the proper notice and comment procedures and was, therefore, void at its inception. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 1723,

60 L.Ed.2d 208 (1979). Consequently, under the facts assumed for purposes of this motion, what would have been hazardous waste subject to RCRA regulation had the Mixture Rule been properly promulgated, escapes regulation because it is not hazardous waste under the **properly promulgated** and enforceable regulations in effect at the times relevant.

The government refers to this as an absurd result. If it is absurd, the absurdity is the direct result of the EPA's failure to promulgate the Mixture Rule properly in 1980. It is the duty of the Court to enforce the law as it existed during the time encompassed by the present indictment, no more, no less. What the law should have been or could have been during this time is of no moment. As a matter of law under the facts assumed here by agreement of all parties, the conduct assumed simply did not violate the properly promulgated and enforceable federal law as it existed during the relevant time period.

In light of all the foregoing, it is hereby **RECOMMENDED** that the defendant's motion to dismiss Counts 1 through 12 of the indictment on the ground that the materials at issue do not constitute a hazardous waste be **GRANTED.**[6]

---

**5.** No reliance is made on the July 29, 1993 letter from defense counsel to the undersigned. Counsel for the government requested permission to respond to it at the August 3, 1993 hearing if the undersigned decided to rely on the letter.

**6.** Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).